# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| John R. McCool, | CIVIL ACTION |
| Plaintiff | NO. |
| and | |
| | **COMPLAINT** |
| NORTHUMBERLAND COUNTY & SNYDER COUNTY, MUNICIPALITIES of the COMMONWEALTH OF PENNSYLVANIA, UNITED STATES Attorney General, Merrick B. Garland, NY Attorney General, Letitia James, DA, Michael Piecuch, DA, Anthony Matulewicz, PA Attorney General, Joshua Shapiro, *in their official capacity* | JURY TRIAL DEMANDED |
| Defendants | |

## COMPLAINT AND DEMAND FOR JURY TRIAL
## INJUNCTIVE AND DECLARATORY RELIEF SOUGHT

Comes now plaintiff, John Robert McCool, files this civil action on behalf of himself (pro Se) in the form of a Complaint against Snyder County, Northumberland County (collectively "the Counties") their municipalities, Sunbury and Middleburg, and its District Attorneys, Pennsylvania Attorney General, (collectively the "Defendants") NYS Attorney General, United States Attorney General for an injunction and declaratory relief under 42 U.S.C. § 1983. Cayuga County, New York had original jurisdiction relating to the issues of the parties in this action; it's addressing a "controversy" between New York State (NYS) and Commonwealth of Pennsylvania (Cmwlth of PA) on United States Constitutional law, Article I, § 10, Clause 3, that resulted in New York court ruling in plaintiff's favor, and Pennsylvania's refusal to record

this ruling in their state; violating the plaintiff's civil rights and creating a cause of action with monetary damages.

**Enters**

The plaintiff, John Robert McCool, is an inmate bringing this action on behalf of himself as a (pro Se) litigant and as such, "As a plaintiff-inmate filed pro se complaints ... seeking damages the Supreme Court found that pro se pleadings should be held to "less stringent standards." than those drafted by attorneys." *Hanes v. Lerner*, 404 U.S. 520 (1971). "Pro se pleadings are to be considered without regard to technically; pro se litigant's pleadings are not to be held to the same high standards of perfection as lawyers." *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1959) *Picking v. Pennsylvania R. Co.*, 151 Fed 2nd 240; Pucket v. Cox, 456 2nd 233. "Pleadings are intended to serve as a means of arriving at fair and just settlements of controversies between litigants. They should not raise barriers which prevent the achievement of that end. Proper pleading is important, but its importance consists in its effectiveness as a means to accomplish the end of a just judgment." *Maty v. Grasselli Chemical Co.*, 303 U.S. 197 (1938). "The plaintiff's civil rights pleading was 150 pages and described by a federal judge as "inept". Nevertheless, it was held "Where a plaintiff pleads pro se in a suit for protection of civil rights, the Court should endeavor to construe Plaintiff's Pleading without regard to technicalities." *Picking v. Pennsylvania Railway*, 151 F.2d 240, Third Circuit Court of Appeals. "The practice of law is an occupation of common right." *Sim v. Aherns*, 271 SW 720 (1925); "There can be no sanction or penalty imposed upon one because of his exercise of Constitutional Rights." *Sherar v. Cullen*, 481 F.2d 946 (1973).

2

## Nature of Case

1. The Interstate Agreement on Detainers Act (IADA) is a congressional lay sanctioned interstate compact within the meaning of the Compact Clause of the United States Constitution, Art I, § 10, cl. 3 and thus is a federal law subject to federal construction. *Carchman v. Nash*, 473 U.S. 716, 719 (1985) (citing *Cuyler v. Adams*, 449 U.S. 433, 438-442 (1981)).

2. The IADA is an interstate compact that prescribes prosecutes by which a member State may obtain for a trial a prisoner incarcerated in another member jurisdiction. The IADA aids in efficient prosecution of crimes and it removes uncertainties that obstruct programs of prisoner treatment and rehabilitation by clarifying prisoner status § 976.05(1), ¶15.

3. 18 U.S.C. app. § 2, art. IV (1982). The IADA provides no mechanism whereby the sending state can initiate transfer and disposition of charges. This probably is not accidental, because prosecutors and correction officials in the sending state may have no desire to enforce the IADA strictly against the receiving state. See Bennett II, Supra note 12, R 23 ("opposition to the [the IAD] may continue to be expected from officials who have no interest in the rehabilitative aspects of criminal justice and who wish to continue manipulating detainers for quasi-judicial and vengeful purposes"). See *infra* note 52. The petitioner has been unable to locate any cases where the sending state moved to intervene to enforce its rights under the IADA.

4. The process established by the IADA is rigorous, See 18 U.S.C. app § 2 arts. IV (a)-(d) (1982); the penalties for noncompliance are severe. See *id*. IV (e) (1982). Art. IV (e) reads in relevant part: if trial is not had on any indictment, information, or

3

complaint contemplated (under art. IV) prior to the prisoner's being returned to the original place of imprisonment [at the earliest practicable time consonant with the purposes of this agreement}, such indictment, information, or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice.

5. The IADA, Art. IV, anti-shuttling provisions, prohibits more than one transfer of the prisoner to the receiving state.

6. The Counties of Cmwlth of PA (aka "receiving state") were parties to the same Interstate Agreement on Detainers Act (IADA), Article IV with NYS (aka "sending state") in 1981. The Counties of the Cmwlth of PA and NYS are forever bonded together in criminal case numbers: 142-1980 and CR-81-71.(See the 1981 Agreement in **Exhibit A**)

7. The Northumberland County (CD-81-71) officers and officials attempted to file a second IADA, Art. IV based on the same criminal charges found on the first detainer application in 1981. (See this attempt in **Exhibit K**)

8. After the 1988 pre-transfer hearing held in NYS court, the Cmwlth of PA decided not to appeal the decision, so the NYS Cayuga County judge handed down the following order, dated February 27, 1989 (See the NY Order in **Exhibit M**):

> "It is **Ordered, Adjudged and Decreed** that the detainer application filed by the Northumberland County, Commonwealth of Pennsylvania is hereby dismissed, and it is further **Ordered, Adjudged and Decreed** that the petitioner's application for a writ of habeas corpus is hereby granted to the extent that the detainer application filed by State of Pennsylvania is dismissed."

9. The NYS court's decision was made by a competent court who had jurisdiction over the Plaintiff and had subject matter jurisdiction. The NYS court followed the

4

absolute language of the anti-shuttling provision in the IADA, Art. IV and the violation was an absolute defense against Commonwealth's underlying indictments. This case was fully and fairly litigated and was final and conclusive to the claims and issues of the parties that are now before this Court and **cannot be re-litigated**.

10. The Judge from Cayuga County in NYS was not aware, while the pre-transfer hearing was going on, the Cmwlth's officers and officials were also prosecuting the plaintiff on the same exact criminal charges the NYS court was about to dismiss with prejudice and they had no intentions of complying with the NYS judge's Order. ( See the Cmwlth's scheme and intention of noncompliance in **Exhibit L**)

11. The Cmwlth's officers and officials usurped the powers of the NYS court and continued on with their prosecution of the plaintiff. The Cmwlth was indifferent to the Full Faith and Credit Clause of Art IV § 1 of the U.S. Constitution, which mandated the Cmwlth to comply with the decision of the NYS court concerning the same subject matter. The U.S. Supreme Court stated, in part, "Requires federal courts and afford the same full faith and credit to state court judgments that would apply in the state's own court." *Durfee v. Duke*, 375 U.S. 106 (1963). The Cmwlth's officer and officials refused to accord full faith and credit to the NYS judge's Order and never recorded the Order in their own state.

12. The duly rendered 1989 Order was valid and the Cmwlth's criminal cases, 142-1980 & CR-81-71, were brought to a finality in 1989 and concluded in plaintiff's favor. **THEREFORE, ALL** the sentences, judgments, orders, and decrees obtained by the Cmwlth's officers and officials, in both state and federal courts, between 1981-present day, are **ALL unenforceable, a legal nullity, invalid and they never**

**become final.** The laws are well established on fraud upon the court[1], invalid & void judgments, and on the principles of validity versus finality.

> "It is a fundamental doctrine of law that a party to be affected by a person judgment must have his day in court and an opportunity to be heard." *Renault v. Abbott*, 116 U.S. 277, 29 L.Ed 629, 6 S. Ct. 1194. A void judgment is a "mere blur on the record, and which it is the duty of the court of its own motion to strike off, whenever its attention is called to it" *M & P Management L.P. v Williams*, Appellant, 937 A.2d 398 (Pa 2007) (citing Romberger v. Romberger, 290 Pa. 454, 457, 139 A. 159, 160 (1927))

13. In paragraphs 1-11, it depicts how the Cmwlth of PA officials and officers have the plaintiff falsely imprisoned in their Department of Corrections (DOC). In addition to paragraph #10, the Cmwlth's officers and officials has the plaintiff trapped in a legal quagmire and judicial nightmare. The Cmwlth of PA courts unconstitutionally retroactively misapplied the Antiterrorism Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (aka AEDPA)[2], an act of the United States Congress that was signed into law on April 24, 1996, to the Counties criminal cases that were concluded in plaintiff's favor seven-years (7) prior to the AEDPA of 1996 becoming law. The Commonwealth officers and officials used this "Act" to conceal their fraudulently begotten criminal convictions, their noncompliance of the Cayuga County's judge February 27, 1989 Order, and their atrocities committed against the

---

[1] Whenever any officer of the court commits fraud during a proceeding in a court, he/she is engaging in "fraud upon the court" In *Bulloch v. United States*, 763 F.2d 1115, 1121 (10th Cir. 1985), the court stated "Fraud upon the court is fraud which is directed to the judicial machinery itself....It is where the court or a member is corrupted or influenced or influence is attempted or where the judge has not performed his judicial function — thus where the impartial functions of the court have been directly corrupted."

[2] APPENDIX D PRESIDENT'S STATEMENT UPON SIGNING THE ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT OF 1996 (See EXHIBIT PP)

plaintiff found within this Complaint that gives him cause of action and his right to monetary damages.

14. The plaintiff has exercised due diligence trying to achieve justice and curing the errors of the most fundamental character in the Cmwlth's state and federal courts, but it has been made impossible due to the Cmwlth's officials and officers having unclean hands and a conflict of interest to allow it to happen.

15. The Cmwlth officers and officials have misused and abused the AEDPA of 1996. They successfully used this "Act" to permanently estoppel the plaintiff from having the New York State Court's Order dated February 27, 1989, recorded in their state. This Order does not exist in the Cmwlth and this is the reason their officers and officials are able to misapply the law to keep from having it enforced. The plaintiff has no other recourse but to go back to the original jurisdiction where the Order originated from and file a Complaint under § 1983 to get plaintiff what he is statutorily and lawfully entitled to. This 1989 ORDER does NOT have an expiration date and there are no time-limits or time-bars preventing this ORDER from being enforced.

16. The Cmwlth's officials and officers have been blatant in how they aren't administering justice within the restrictions of the laws that govern our country, but rather their dispensation of justice was with absolute power and tyranny. They detested the decision of the NYS Court and usurped powers over their judicature, and plotted against the plaintiff to forfeit his life while he was in NYS's jurisdiction. Their double-dealings have been very successful in kidnapping and subjugating the plaintiff to live out the rest of his life in the Cmwlth's correctional institution.

17. The NYS's court, like Cmwlth of PA court, is a court of law located within the territory of the United States of America where the Constitution is a Supreme Law of the country. The supreme law of the Constitution has sanctioned the NYS court the power to grant the plaintiff his habeas corpus relief back in 1989 due to the Cmwlth's officers and officials violating the IADA, Art IV (e) in 1981. This relief was provided to the plaintiff to protect him from further prosecution on the exact same criminal charges alleged in criminal case numbers 142-1980 and CR-81-71, however, the Cmwlth's officers and officials unlawfully did so anyway, and has held the plaintiff illegally against his will for decades in their Department of Corrections.

> It was in *Marbury v. Madison*, 5 U.S. (1 Cranch)137 (1803), a landmark case of the U.S. Supreme Court that established the principle of judicial review in the United States, meaning that American courts have the power to strike down laws, statutes, and some government actions that they find to violate the Constitution of the United States. It was decided in 1803, and Marbury remains the single most important decision in American constitutional law.

18. **NYS is the <u>only</u> state that has the complete record on the subject matter that is before this Court, including the February 27, 1989, Order. The Cmwlth of PA does not.** Their incomplete record made it possible for the Cmwlth's officers and officials to get the plaintiff permanently estoppelled by the AEDPA of 1996 in their state and federal courts. The plaintiff has no other remedy available to him in the Cmwlth of PA, as this Honorable Court can see in Exhibit KK where the Pennsylvania Supreme Court Clerk(s) specifically told the plaintiff in their September 2021 letter refusing to file his Mandamus under § 1983, and returned his money order in the amount of the required fee to file it. Next time, the Clerk told the plaintiff, all further attempts will be ignored.

8

## Parties

19. Defendant, Michael Piecuch is the District Attorney of Snyder County, Pennsylvania responsible for the administration of justice in Snyder County, including but not limited to according full faith and credit to a sister state's court decision in a matter requiring the dismissal with prejudice of all criminal charges filed against the defendant under the Interstate Agreement on Detainers (IAD) Act by the defendant's predecessors.    Located: 9 West Market Street, P.O. Box 217, Middleburg, PA 17842

20. Defendant, Anthony Matulewicz is the District Attorney of Northumberland County, Pennsylvania responsible for the administration of justice in Northumberland County, including but not limited to according full faith and credit to a sister state's court decision in a matter requiring the dismissal with prejudice of all criminal charges filed against the defendant under the Interstate Agreement on Detainers (IAD) Act by the defendant's predecessors. Located: 201 Market Street, 3rd Floor, Sunbury, PA 17801

21. Defendant, Letitia James is the Chief Law Enforcement officer of the state of New York responsible for the administration of justice in the state of New York, including but not limited to assuring the compliance of any and all decisions rendered by a New York court. Located: The Capitol, Albany, NY 12224-0341

22. Defendant, Joshua Shapiro is the Chief Law Enforcement officer of the Cmwlth of PA responsible for the administration of justice in the Cmwlth of PA, including but not limited to according full faith and credit to a sister state's court decision in a matter requiring the dismissal with prejudice of all criminal charges filed against the

9

defendant under the Interstate Agreement on Detainers (IAD) Act. Located: 16th Floor,Strawberry Square, Harrisburg, PA 17120

23. Defendant, Merrick B. Garland is the Attorney General of the United States responsible for the administration of justice in all 50 states and territories thereof, including but not limited to the enforcement of a Compact Agreement sic., the Interstate Agreement on Detainers (IAD) Act, requiring the dismissal with prejudice all criminal charges when a prisoner is returned to the sending state before the criminal charges against him were finally disposed of. Located: U.S. Department of Justice, 950 Pennsylvania Avenue, NW, Washington, DC 20530-0001

24. Defendant, Snyder County is within the boundaries of the Cmwlth of PA responsible for the administration of justice in the County of Snyder, including but not limited to honoring its Compact Agreement with the state of New York requiring the dismissal with prejudice all criminal charges after the defendant was returned to the state of New York before those criminal charges were finally disposed of.

25. Defendant, Middleburg is a borough within the boundaries of the County of Snyder, Pennsylvania, and the municipality where the officers and officials are from who were acting under color of law when they refused to honor the Compact Agreement with the state of New York and refusal to record the February 27, 1989 Order,

26. Defendant, Northumberland County is within the boundaries of the Cmwlth of PA responsible for the administration of justice in the County of Northumberland, including but not limited to honoring its Compact Agreement with the state of New York before those criminal charges were finally disposed of.

27. Defendant, Sunbury is a city within the boundaries of the County of Northumberland, Pennsylvania, and the municipality where the officers and officials are from who were acting under color of law when they refused to honor the Compact Agreement with the state of New York and refusal to record the February 27, 1989 Order.

## Jurisdiction and Venue

28. Diversity jurisdiction in the federal courts is to provide another forum to determine the rights of the parties. Diversity jurisdiction is founded on assurance on non-resident litigants on courts free from susceptibility of potential bias. So Congress afforded out-of-state litigants another tribunal not another body of law. (See *Guaranty Trust Co v. York*, 326 U.S. 99 111-21 (1945) *Cf. Byrd v. Blue Ridge Rural Elec. Co-op Inc.*, 525 536-39 (1958).

29. This Court has original subject matter jurisdiction over federal constitutional violations alleged in this Complaint and over the federal law claim identifying the Interstate Agreement on Detainers (IAD) Act pursuant to 42 U.S.C. § 1983, 28 U.S.C. §§ 1331, 1343 and jurisdiction over state law claims, pursuant to the principles of pendant and ancillary jurisdiction. This Court has jurisdiction to issue injunctive and declaratory relief pursuant to 28 U.S.C. § 2201 and 42 U.S.C. § 1983.

30. Alternatively, this Court has jurisdiction because this case is a diversity case involving the plaintiff, a former NYS citizen, who is now currently being held against his will in the Cmwlth of PA, two separate states pursuant to 28 U.S.C. § 1332 where New York conclusively terminated the alleged criminal charges pursuant to

11

the IAD's "anti-shuttling" clause and the Cmwlth of PA circumvented the IAD's no-return-clause by falsely claiming that the plaintiff was a fugitive, (Diversity Clause of the U.S. Constitution, Article III, § 2, Clause 1) The Interstate Agreement on Detainers Act is part of the United States Constitution's Compact Clause, Article I, § 10, Clause 3. Venue is proper under 28 U.S.C. §1391(b) because the cause of action upon which the complaint is based arose in the county of Cayuga which is in the Northern District of New York.

### Facts of the Case[3]

### (a) The Interstate Agreement on Detainers Act

31. On February 16, 1981, the Defendant's obtained temporary custody of the plaintiff pursuant to an Article IV (IAD) Agreement, who was a prisoner at the Auburn Correctional Facility under the jurisdiction of the state of New York, which is a party, as is Pennsylvania, to the Interstate Agreement on Detainers (IAD) Act. A true and correct copy of the 1981 IADA, Art.IV is attached hereto as Exhibit A.

32. The indictments against the plaintiff arose from the introduction of composite drawings from two prostitutes, from two different counties, who initially alleged to have been constructed from their memory and who later identified the Plaintiff at his preliminary hearing following his return to Pennsylvania on February 16, 1981.

---

[3] Attached are exhibits containing testimonies (in the form of letters written to the plaintiff), court documents and interoffice communications from the Cmwlth of PA officers and officials reflecting what has been going on since 1980. More evidence and proof can be ascertained through the discovery phase.

*NOTE: Most of the Exhibits attached to this Complaint should not exist, by law, after 1981. The criminal charges were mandated to be dismissed according to IADA, IV (e) and after February 27, 1989 when the NYS Court made a final ORDER that dismissed all Cmwlth's criminal charges and granted the Plaintiff his habeas corpus relief.

33. However, while the trial process was still going on, in both counties, the prostitutes had a change of heart and confessed to the trial Judges how they were provided plaintiff's prison intake photograph, taken at the Attica Correctional Facility on November 13, 1980, by the prosecution so that they could accurately describe the Plaintiff to the artist drawing their composite.

34. So Judge Wilson in Snyder County ordered Plaintiff's trial attorney to file a motion by March 4, 1981, to dismiss all charges, but before that process took place, Plaintiff was moved to Northumberland County on March 2, 1981, *Commonwealth. v. McCool,* 457, A.2d,1312 (Pa.Super.1983) (see Exhibit NN). A true and correct copy of the Snyder County Official Record is attached hereto as Exhibit B.

35. When the case in Northumberland County was falling apart, Judge Ranck took control and solved the dilemma by ordering Plaintiff's return back to New York on June 10, 1981, allowing Assistant Prosecutor Thomas Boop, Esq. to prosecute plaintiff in absentia. A true and correct copy of the NYS Out of Court document is attached hereto as Exhibit C.

36. Plaintiff's ineffective trial attorney, Harry Wilcox, Esq., did not file the motion Judge Wilson ordered him to do, and aided Snyder County's Prosecutor John Robinson in his continuance of prosecuting the plaintiff in absentia. (see Exhibit B)

37. On March 4,1981, Northumberland County consolidated its case against the petitioner with the case out of Snyder County by signing onto the Article IV (IAD) Agreement the Snyder County officials had with the State of New York. A true and correct copy of the 1981 IADA, Art.IV is attached hereto as Exhibit D.

38. What the Plaintiff began to understand later about the facts relating to his criminal cases were that the prostitutes were initially pointing their fingers at their pimp, unbeknownst to them, was an undercover cop working for the tri-county area (Snyder, Union and Northumberland County) to uncover drug trafficking. They were trying to have their pimp arrested under his assumed name for forcing them into prostitution, after he had initially got them to volunteer, later they decided to quit and he wouldn't let them. One of the prostitutes ended up impregnated by a law enforcement officer in Northumberland County while she was in his custody. He married her after divorcing his wife, who was childless and unable to produce his children. His fear was as the Chief of Police his new wife was putting his career in jeopardy for seeking arrest of this undercover tri-county cop, turned pimp.

**(b) return to NYS**

39. The plaintiff was returned to NYS on June 10, 1981, by the Defendant. He did not arrive back to NYS prison until late evening when the intake office was closed. The intake office did not process the plaintiff back into the prison until the next day, June 11th, when the office was open. The plaintiff had the assurance that the criminal charges out of the Cmwlth of PA were dismissed with prejudice since the Commonwealth's criminal cases filed against the plaintiff were falling apart, due to lack of evidence, and the prostitutes were recanting their testimony against the plaintiff.

40. The plaintiff decided to take the opportunity to enroll in some of the rehabilitation programs NYS's prison system had to offer. One of the opportunities he had was to go to college. Plaintiff applied and got accepted into the Business Administrative

14

Curriculum at Ulster County Community College in Stone Ridge, New York. A true and correct copy of the college acceptance letter and courses document is attached hereto as Exhibit E.

41. Not long after Judge Samuel Ranck sent plaintiff back to New York, Plaintiff found out that the Defendants in the Commonwealth continued to exercise jurisdiction where none existed. As it turns out, the Defendants, in unison, never stopped prosecuting the plaintiff after his return to NYS.

42. While plaintiff was back in NYS, on October 14, 1981, public defender, Harry Klein, Jr, Esq. wrote to the plaintiff stating: "I enclosed a certified copy of my appointment as your counsel. I replaced your trial counsel who requested to have been granted leave to withdraw. I will be handling your appeal." A true and correct copy of the letter attached hereto as Exhibit F.

43. In a letter dated January 16, 1982, Harry Klein, Jr, Esq. wrote to plaintiff "I appeared before a three judge panel of the Superior Court in Philadelphia. PA on January 5, 1982, and orally argued your case in your behalf. After I outlined your pre-trial, trial and post-trial experienced here all one of the judges could do was to shake his head." On March 25, 1983, Plaintiff's appeal was granted on the basis of ineffectiveness assistance of trial counsel.[4] (*Commonwealth v. McCool, 457,* A.2d,1312 (Pa. Super. 1983). (see Exhibit NN). A true and correct copy of the document is attached hereto as Exhibit G.

---

[4] Note; the state at this time lost personam and subject matter jurisdiction.Despite this fact, the Defendants had one (1) year from March 25, 1983, to comply with the Superior Court's mandate under PA Rules of Appellate Procedure or be barred from taking any further action against the plaintiff. They circumvented the rule on May 14, 1984, when the Defendants laid claim that the plaintiff was a fugitive from justice and tempted to return the plaintiff to PA pursuant to a Requisition Request under the Uniform Extradition Act.

44. After the Superior Court's 1983 Order, the Defendants came up with a ploy to divert plaintiff's attention away from the 1981 Art. IV, [IADA] Agreement and concocted a ruse to try to "cause" plaintiff to bind himself to file an (IADA) Article III to return himself back to Pennsylvania. The district attorney's office worked with the court appointed public defender, Harry Klein, Esq. to make it happen but their attempt was futile. A true and correct copy of the 1983 Order is attached hereto as Exhibit H.

45. This ruse is evident in the letter dated January 27, 1984, when Thomas Boop, Esq. sent a letter addressed to Judge Samuel Ranck, supplying copies to Harry Klein, Jr. Esq., Robert B. Sacavage, Esq., DA, James Rosini, Esq., and Northumberland County's law enforcement officer Park Beaver. The letter states: "As you recall, after the Superior Court remanded this matter back to the Court of Common Pleas, you entered an Order scheduling an extraordinary hearing for 1:30pm on May 3, 1983. After it became apparent that the defendant could not be brought down from the State of New York in time for said hearing, the matter was continued pending further Order of Court. Since May 3, 1983, it has been my understanding that Mr. McCool's counsel, Mr. Klein, has been pursuing the necessary steps to have Mr. McCool produced in Pennsylvania under the interstate agreement on detainers. It has also been the position of the District Attorney's Office of Northumberland County that, with respect to the evidentiary hearing following the remand by the Superior Court, it was the defendant's obligation to make himself available for said hearing and not the obligation of the Commonwealth. Now that I left the District Attorney Office I am concerned that the matter be given attention and if you would

consider scheduling a conference of all counsel involved, I would certainly be willing to attend to provide any additional information that might be necessary. . A true and correct copy of the document is attached hereto as Exhibit I.

46. These double-dealings continued, from that meeting we see, they decided to have the newly-elected district attorney, Robert B. Sacavage, Esq. file an *Application for Requisition* dated May 14, 1984, with the governor of Pennsylvania falsely claiming plaintiff was a fugitive from justice, from a previous Application for Requisition in 1981. This act resulted in plaintiff being transferred to a high-security prison in NYS and it had an adverse effect by altering the course of plaintiff's access to any rehabilitation programs. He lost all his privileges, and at the end of the same year, plaintiff was forbidden to continue on with his enrollment at the Ulster County Community College.A true and correct copy of the Requisition is attached hereto as Exhibit J.

### (c.) Northumberland County files second (2) IADA, Art. IV with NYS.

47. When the governor found out plaintiff **was not** a fugitive from justice, as the Application claimed, the state put this issue on hold until October 4, 1988, when the state's modus operandi in securing custody of plaintiff were exhausted. The Defendants only recourse was to file an impermissible second Art. IV (IADA) Agreement; based on the very same charges as the first one. The case and matter was held over at the pre-transfer hearing in the NYS court. The Court was presented merits on whether a second Art. IV (IAD) Agreement was legal or in violation of the double jeopardy clause. It was settled decisively by the New York Habeas Court when it decided that the criminal charges were no longer of any force

or effect to bind Plaintiff over to Pennsylvania to defend himself against. A true and correct copy of the second IADA, Art. IV is attached hereto as Exhibit K.

### (d) NYS Order

48. During the 90-day-period the New York Habeas Court placed its decision in abeyance to give the prosecutors in Pennsylvania time to appeal its decision to the NYS Appellate Court. Instead, on February 22, 1989, the Defendants spent their time concocting a document that would provide them a "cause" to hold a hearing in the Northumberland County Court of Common Pleas without plaintiff's presence. A true and correct copy of the document is attached hereto as Exhibit L.

49. After the 90 days, February 27, 1989, the written, signed and recorded order was served upon the prosecutors informing them they ruled in Plaintiff's favor.. . A true and correct copy of the Order is attached hereto as Exhibit M.

50. The Defendants did not stop mobilizing against plaintiff in February 1989! By December 11, 1989, the prosecutors were arranging for an Executive Agreement to trick the governors of New York and Pennsylvania into extraditing plaintiff to Pennsylvania as a Witness in a Criminal Proceeding. A true and correct copy of the Agreement is attached hereto as Exhibit N.

51. This ploy worked! In January 1990, plaintiff was extradited back to Pennsylvania by prosecutor Robert B. Sacavage, Esq. where he and Judge Samuel Ranck, contrary to law, reopened the inactive criminal case no. CR-81-71 that was vacated by the Pennsylvania Superior Court in 1983.[5]

---

[5] see: Rule 3115, Pennsylvania Rules of Appellate Procedure (citing Rule 1901(c) of the Pennsylvania Rules of Judicial Administration

52. Without legal authority or jurisdiction, Judge Samuel Ranck usurped Superior Court's 1983 decision by claiming the Superior Court's 1983 Judgment was without merit and plaintiff had effectiveness assistance of trial counsel, providing them "cause" to restore the case and matter in criminal case no CR-81-71. A true and correct copy of the document is attached hereto as Exhibit O.

53. As evident by plaintiff's letter dated January 25, 1990, to his court appointed attorney, Harry Klein, Esq. Jr. stated "What am I doing down here if not to have this case dismissed pursuant to the dismissal clause of the Interstate Agreement on Detainers Act. I want you to submit my petition for habeas corpus when we all in court for that January 28, 1990, hearing. The one I sent you from New York will do. It has the copy of the Order out of New York that dismissed the case pursuant to the Criminal Procedure Law Section 580.00 governing the Detainer Act in New York. Pennsylvania adopted this same Interstate Agreement on Detainers Act. There can be no excuse. I want the petition filed. And by the way my ex-wife told me to tell you to stick it. Why did she tell me to say this. Please Respond" . A true and correct copy of the letter is attached hereto as Exhibit P.

54. Immediately, Judge Ranck's illegal convicted the plaintiff, and unjustifiably had the court order CR-81-71 to be sealed. He further ordered that it can only be reopened after seeking and obtaining the trial court's permission. A true and correct copy of the letter confirming plaintiff's record is sealed is attached hereto as Exhibit Q.

55. On June 18, 1990, the state prosecutors refiled a commitment detainer with New York. Just prior to plaintiff's release, the Defendants were notified and on March 7,

19

1995, Plaintiff completed his NYS prison sentence. [CR-81-71]. . A true and correct copy of the document is attached hereto as Exhibit R.

### (e) PCRA and appellate courts: the endless legal battle begins

56. On March 7, 1995, plaintiff was taken into custody by agents working for the Pennsylvania Department of Probation and Parole, pursuant to an outstanding Parole Warrant filed with NYS following plaintiff's return to NYS, plaintiff began serving out the remaining three-years. . A true and correct copy of the document is attached hereto as Exhibit S.

57. In June 1996, while Plaintiff was at SCI-Huntington, serving out those three years, the Defendants informed Plaintiff that the detainers lodged by the Counties in 1981 were duly tried and convicted, forcing Plaintiff to begin his decades long fight with the state PCRA courts on criminal charges that were dismissed with prejudice back in 1989.

58. In July 1996 Plaintiff filed a PCRA petition asking the court to accord full faith and credit to the New York Habeas Court 1989 Judgment. Plaintiff wanted those criminal charges terminated to not give SCI-Huntington "cause" to keep him incarcerated.

59. The PCRA Court in Snyder County initially appointed Anne Shapiro, Esq. as plaintiff's public defender. . In a petition filed by Anne Shapiro, Esq., sent to the plaintiff it read as follows: "There were initially some concerns that Mr. McCool was represented by Mr. Wilcox, the Snyder County Public Defender at the time of Mr. McCool's initial trial, and that this may present some conflict of interest. Defendant has since received written correspondence from Mr. McCool in which he expressed

some concerns about the appointment of the Snyder County Public Defender who represented him during his trial and he is alleging Mr. Wilcox's ineffectiveness. In view of Mr McCool's expressed concerns defendant requests that the Court appoints new counsel who is not a member of the Public Defender's Office."A true and correct copy of the letter is attached hereto as Exhibit T.

60. This request was denied, the PCRA Court Judge, Woelfel, appointed Public Defender, Vincent R. Mazeski, Esq. He reviewed Plaintiff's petition and told him that any decision by a New York Court concerning any criminal charges brought in a Pennsylvania Court would only apply back in New York where the decision was rendered and not in Pennsylvania where the alleged criminal acts occurred. Vincent R. Mazeski, Esquire amended Plaintiff's petition and made changes to it and obscured the facts, making it significantly different than what actually occurred. He refused to cite the facts as they should have been presented. For starters; he left out Pennsylvania's 1981 Art. IV (IAD) Agreement and pursued claims unrelated to anything that would have validated the claim that the criminal charges underlying Pennsylvania's 1981 Art. IV (IAD) Agreement was thrown out by a New York Habeas Court. Instead, he pursued claims based on the presumption that the criminal charges were duly prosecuted and terminated in the Pennsylvania's favor in line with what was on record. He understood that the Interstate Agreement on Detainers was all the proof Pennsylvania needed to support any judgment that came as a result. However, he had premeditatedly misconstrued the differences between an Art. III (IAD) verses an Art. IV (IAD) Agreement. A true and correct copy of the Amended Petition is attached hereto as Exhibit U.

61. When Plaintiff discovered that Vincent R. Mazeski, Esquire's amended petition failed to make the distinction between an Art. III and an Art. IV allowing the assumption to go unchallenged that Pennsylvania had jurisdiction to obtain the judgments for which the prison officials at SCI-Huntington claimed to be "cause" for his continual incarceration. it compelled plaintiff to protest to the PCRA Judge Woelfel. Judge Woelfel imparted plaintiff's letter of protest back to Vincent R. Mazeski, Esquire, who in response was to rather than fixing the problem, he sent the plaintiff a scathing letter to the plaintiff.

### (f.) Public defender Mazeski writes a scathing letter to plaintiff and denies his allegations of him wanting to work for the District Attorney's office

62. In a letter dated September 11, 1996, Vincent Mazeski, Esq. wrote to plaintiff "I am in receipt of your recent correspondence. I am writing to advice you, as your Court-appointed attorney, to cease and desist from writing the Court. It is unethical for an attorney to contact the Court outside the presence of the District Attorney. Obviously, you are not an attorney and probably do not care about these rules of professional conduct. However, your direct contact with the Judge will probably be construed in a negative manner. To put is simply, it detracts from your credibility. I am also in receipt of your letter which seems to indicate that you know more about my future than I do. I was not aware that I would be running fo the State Legislature or for the Office of District Attorney in the future. If you are convinced that I am corrupt and/or politically motivated, you have the option of waiving your right to counsel at the next hearing. If you are inclined to do this, please feel free to do so, it will not offend me. In the meantime, I will be preparing for your next hearing. As your attorney of record, I am advising you to stop writing the Judge. Your failure to

follow my advice will only be to your detriment." A true and correct copy of the letter is attached hereto as Exhibit V.

63. Despite plaintiff McCool sought to have Vincent Mazeski, Esq. removed from his case, Mr. Mazeski, plaintiff was denied, and he continued to represent him.

64. Consequently on February 11, 1997, the PCRA Judge Woelfel denied plaintiff PCRA. Relief based on Mazeski's amended version of plaintiff's PCRA (IAD) claims.

65. February 18, 1997, plaintiff filed his appeal of the PCRA Judge Woelfel's order of February 11, 1997 denying his PCRA Relief based on Mazeski's (IAD) claims. A true and correct copy of the two documents are attached hereto as Exhibit W.

> *Commonwealth v. McCool*, 724 A.2d 957 (Pa. Super. 1998) (unpublished memorandum) appeal to the Supreme Court denied, 751 A.2d, 187 (Pa. 2000), providing plaintiff standing to pursue federal habeas relief.

66. July 29, 1998, a Judgment was entered for case no. 238 HBG 97 dismissing plaintiff's appeal. Because the order of February 11, 1997, did grant Mazeski's PCRA Claim asking the PCRA Court to restore plaintiff his right to a direct appeal the case and matter of pursuing his remedy in federal court regarding his (IAD) claims was put on hold until the direct appeal was processed and disposed of on September 3, 1999 and became final in January of 2000. A true and correct copy of the July 29, 1998, document is attached hereto as Exhibit X.

**(g.) 2000-present, legal battle continues Public Defender Mazeski starts working for the District Attorney's Office**

67. A new public defender, James Best, Esq. was appointed to plaintiff's case. On May 11, 2000, he wrote to Plaintiff McCool as follows: "I am now the conflicts counselor for Snyder County and will represent you on further state court proceedings as **Mr.**

**Mazeski is now the assistant district attorney for Snyder County.** The appeal which Mr. Mazeski represented you on is exhausted as the Supreme Court denied allocator. It may be a federal habeas corpus action is now your best option for seeking relief." A true and correct copy of the letter is attached hereto as Exhibit Y.

68. August 15, 2000, a petition for writ of habeas court was filed with the federal court for the Middle District docketed as case no. 4:00-cv-01418. . A true and correct copy of the document is attached hereto as Exhibit Z.

69. The "cause" of the dismissal order for failure to exhaust state remedies was the impediment in the process through which the order was reached when the Attorney General of Pennsylvania and the District Attorney of Snyder County failed to comply with Magistrate Judge Blewitt's ORDER of August 18, 2000, directing them to provide the court a complete record. Precluding plaintiff from a full and fair proceeding. A true and correct copy of the document is attached hereto as Exhibit AA .

70. January 23, 2001, a Report and Recommendation was filed by Mag. Judge Blewitt recommending the petition for Habeas Corpus be dismissed. On February 16, 2001, an order was filed by Judge Malcolm Muir adopting in total Magistrate Judge Blewitt's Report and Recommendation, dismissing the habeas corpus petition for failure to exhaust state remedies.

> *Commonwealth v. McCool,* No. 1620 MDA 2002 (Pa. Super Filed July 12, 2002).
> Because of the separate action when the plaintiff pursued his federal habeas relief, the District Court found that plaintiff was procedurally barred from pursing the IADA claim pending exhaustion of his state remedies. It was after this remand back to the state court, the state contended that plaintiff was procedurally barred and thereafter every attempt, plaintiff made to get the IADA claim heard by the federal court was estoppelled by the Anti-Terrorism and Effective Death Penalty Act.

**(h.) <u>Pennsylvania Department of Corrections usurp powers over federal judge's order refusing to release plaintiff's records to him</u>**

71. On August 30, 2001, James Best wrote to Plaintiff McCool as follows: "Thank you for your recent correspondences to me, which are every helpful in preparing to the upcoming hearing. I look forward to meeting you in person and hope that we will have some headway in dealing with your terrible order of the last 20 years." Promptly upon plaintiff's advent into Pennsylvania's Department of Correction's facility in 1995 he was deprived of his legal papers. On September 14, 2001, Judge Blewitt, gave an order to the Department of Corrections (DOC) to release these records to him, but they refused. . A true and correct copy of both documents are attached hereto as Exhibit BB

72. On March 18, 2002, a letter was sent to the plaintiff by James Best, Esq, appointed in plaintiff's case it states as follows: "I hope that the new federal petition will provide the avenue for you to receive justice. As you know from other recent correspondences, I have filed the brief with the Superior Court with respect to the most recent PCRA. In all honesty, I assume that the Superior Court will reject the appeal. I make that assumption from the Superior Court's prior approach towards your case. Assuming that the Superior Court so rules, I will file the Petition for Allocatur and if that is rejected you will certainly have exhausted your PA rights. <u>From my recent review of your case, I am again struck by the fundamental unfairness of your being forced to go from learning about the charges to trial in less than 2 weeks. That is (in my opinion) so far below a minimum standard of due process as to be fundamentally unconstitutional. I understand the argument that</u>

not all IAD violations are remedial but in your case the prejudice was severe. Any experienced criminal defense attorney will advise you that a rape and kidnapping case would take months of pre-trial preparation including discovery, investigation into witnesses, possible alibis and so forth. There is no way that Harry Wilcox (whose reputation lingers long after his death) could have prepared any defense, let alone an effective defense in 10-14 days." A true and correct copy of the letter is attached hereto as Exhibit CC.

73. After many attempts to get the Department of Corrections to comply with the order, On December 23, 2002, Superintendent wrote plaintiff a letter stating: "Your request for additional storage boxes to accommodate your legal work has been denied. Mr. Jerome reviewed your legal material and has reported that two (2) state cases are no longer active but that you have three (3) active federal cases you would have sufficient storage space for your federal legal material. If you decide to mail out your state legal material, please contact Sgt. Yates."A true and correct copy of the document is attached hereto as Exhibit DD.

74. The Superintendent, Mr. Jerome, and Sgt. Yates, are not licensed attorneys, they have had no legal background or experience, and they didn't understand the plaintiff was in federal court because of those two state cases. Those materials were needed to prove his case in federal court.

75. It was not until plaintiff was transferred to SCI-Coal Township in March 17, 2011, it was discovered within the van the "missing" records the Department of Corrections obstructed from being released to the plaintiff a decade earlier. It prompted plaintiff to petition the Facility Manager to allow him to take possession of those records

and his request was granted. A true and correct copy of the document August 10, 2011, is attached hereto as Exhibit EE.[6]

76. May 31, 2011, plaintiff pursued an action under 42 USC § 1983, with the Middle District Court, docketed case no.4-11-cv-01038 seeking damages based upon Pennsylvania's failure to comply with a duly, signed and recorded New York Habeas Court Order granting him the "Great Writ. The federal court quashed the case by not applying civil law but rather estoppelling the plaintiff by applying the criminal law, Anti-Terrorism and Effective Death Penalty Act (AEDPA) of 1996, to deny plaintiff relief he is entitled to.

77. Despite this draconian decisions made by the federal court, plaintiff was provided for the first time a certified copy of the criminal docket entries out of Snyder County, extracted from the record on October 12, 2011. It was the first time plaintiff was able to see with his own eyes the proof he needed to not only sue for damages but the proof he needed to have his 2000 Habeas Petition resurrected. (See Exhibit B)

---

[6] The Plaintiff's life changed in 2010 when his daughter, Stephanie Ann Ripple, showed up into his life. It was a union he thought would never happen due to circumstances beyond his control. It was God's Will that the Plaintiff's daughter was able to fulfill her mission to find him. It was 2009 the Plaintiff ran out of options to continue his fight for freedom. Miraculously, by the grace of God, in 2010, his daughter found him and picked up his fight. It was during this time plaintiff gained access to his legal documents for the first time. The Plaintiff immediately sent these records to his daughter and she breathed new life into his case. She has been doing everything possible to get justice for her father, the Plaintiff. There were a plethora of facts the Plaintiff found out that his Public Defenders neglected to tell him. Ever since plaintiff's daughter's involvement, the Cmwlth officers and officials and their Department of Corrections have been targeting her on so many occasions, jeopardizing her safety and wellbeing numerous of times. However, nothing they do will deter his daughter from giving up. Plaintiff's daughter's fight will continue until justice prevails. To aid her plight in getting her father, the plaintiff, his justice and his freedom, the Plaintiff has appointed her as his Power of Attorney (See Exhibit OO)

78. Not one of plaintiff's public defenders ever gave him a copy of Snyder County's official record. In October 2011, he found out their record was not complete and full of errors.[7] Upon inspection of this official record, he noticed so many facts missing, for e.g. **It had not chronicled:** (1) March 2, 1981, transfer to Northumberland County. (2) March 4, 1981, Northumberland became partied to the IAD, Art.IV with Snyder County. (3) No mention of plaintiff's return to NYS on or about June 10, 1981. (4) Snyder County record established a narrative that plaintiff never left the Pennsylvania and resided at Camp Hill. (5) No mention of the dismissal of the detainer application by the NYS Court and the habeas corpus granted to the plaintiff. (6) It's appearance suggests being cut and pasted together and out of chronological order and trivial handwritten notations are throughout and no way of knowing who wrote it. It was the record submitted to all the state and federal courts, including the PCRA Courts. (See Exhibit B)

79. February 16, 2012, the issue of the New York Habeas Court's order was brought before the Counties in the form of a Petition for a Writ of Habeas Corpus.

80. However when plaintiff's petition reached Judge, Robert B. Sacavage, Esq[8], who was the prosecuting attorney and the recipient of the signed, written, and recorded New York Habeas Court's order dated February 27, 1989, used his power and authority as judge to quash the petition. A true and correct copy of the documents is attached hereto as Exhibit FF.

---

[7] violation of 234 Pa. Code Rule 113

[8] Robert B. Sacavage was sworn in as Northumberland Court of Common Pleas Judge by PJ Samuel Ranck on December 29, 1995. . A true and correct copy of the document is attached hereto as Exhibit LL.

81. December 18, 2013, the plaintiff attempted to get the Counties to apply full faith and credit to the 1989 NY Order. Snyder County Judge Woelfel denied the plaintiff. The Northumberland County judge never responded. A true and correct copy of the document is attached hereto as Exhibit GG.

82. The Commonwealth's state and federal courts have been so biased and prejudice against the plaintiff by the Defendants. In 2015/2016, the federal district court magistrate judge acknowledged that the plaintiff was taken back to NYS. However, the magistrate judge did not acknowledge the significance of this. Instead, the magistrate judge attempted to correct the plaintiff by saying that it was not the 10th but the 11th of June the plaintiff was returned to New York. The plaintiff knows first hand when he was taken back to New York. This magistrate judge failed to take into account the miles the Commonwealth officers had to travel to return the plaintiff back to NYS and the prison's intake office hours. This magistrate judge failed the plaintiff, and helped perpetuated this egregious miscarriage of justice by focusing on trivial facts. This judge disregarded all the documented evidence provided to the court by the plaintiff. The same evidence attached as "Exhibits" in this Complaint.

83. August 7, 2018, out of plaintiff's frustration, plaintiff took a different approach. He sought out the help from the Northern District Court of NY, seeking to get the NY judgment controversy transferred to the Third Circuit Court in hopes to finally get a full & fair hearing by getting the case transferred from the jurisdiction where the 1989 Order originated however this attempt was futile. The Third Circuit Court

refused to do so.. A true and correct copy of the Judgment is attached hereto as Exhibit HH.

84. December 2019 the Plaintiff filed an Application for a Certification of Appealability, Standard of Review in District Court case no. 4-00-cv-01418 with the Third Circuit Court of Appeals, and it was docketed as case no. 19-3888. Once again, the Third Circuit Court refused to do so, the plaintiff's voice to be heard was quell once more. A true and correct copy of the July 10, 2020, document is attached hereto as Exhibit II.[9]

---

[9] The Petitioner reopened the case to get the Third Circuit Court to resurrect his initial petition under a standard of review after recovering the documents dated 7/29/98 and 8/3/99 which set the stage to file a rule 60(b) motion under Gonzalez v. Crosby, 545 U.S. 524, 125 S. Ct. 2641, 162 L.Ed 2d, 480 (2005).Gonzalez made clear that a rule 60 (b) motion is a "true" 60 (b) motion if it challenges only the procedural ruling of a habeas court that precluded a merits determination of the habeas application. Gonzalez, 545 U.S. at 532 n.4 or challenges a defect in the integrity of the federal habeas proceedings, such as an assertion of fraud. Gonzalez, 545 U.S. at 532: Abdul 'Rahman v. Bell, 537 U.S. 88 (2002) makes it perfectly clear that when a motion is valid Rule 60 (b) filing, the Court of Appeals had jurisdiction to review the District Court's denial of relief — either because that denial was a final order from which petitioner filed a timely appeal, or because the District Court had transferred the matter of the Court of Appeals pursuant to § 1631. In either case the issue was properly before the Court of Appeals , and since the jurisdictional bar in §2244 (b)(3)(E) does not apply to Rule 60 (b) motions — it is necessary to identify the differences between  a Rule 60 (b) motion and a second or successive habeas corpus application. In this case petitioner was impugning the integrity of the district court's judgment rejecting his initial petition by claiming the petitioner failed to exhaust his state remedies, clearly "unreasonable determination of facts" under 25 U.S.C. § 2254 (d)(2).. considering the fact that for some unknown reason the Superior Courts judgment of 7/29/98, where the petitioner's nunc pro tunic direct appeal, appealed the PCRA Court's 2/11/97 Order, denying him his IAD claims (See *Com. v. McCool*, 724 A.2d 957 (Pa. Super. 1998). Otherwise had the Superior Court and the District Court not overlooked petitioner's 7/29/98 judgment, his initial petition would not have been able to claim as it later did... that petitioner waived his IAD claims.. preventing the district court from taking jurisdiction over petitioner's IAD claims when petitioner returned to the federal court in 2002. For this reason and for this reason alone.. every attempt that petitioner has made to revive his case was blocked by the passage of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) restricting the ability of federal courts to award relief to a state prisoner who files successive habeas corpus petition.. even though petitioner raised claims that there were two prior judgments for which their determinations effectively nullified any convictions that were based on the criminal charges underlying the 1981 Article IV and Article V (d) (IAD) Agreements. The power of the federal courts appears to be expressly recognized in Rule 60 (b) of the Federal Rules of Civil Procedures, which states in part: This rule does not limit the power of court to entertain an independent action to relief a party from a judgment, order or proceeding Fed.R.Civ.P. 60 (b) See *Barron & Holtzoff* § 1331.

85. On April 6, 2021, the Third Circuit Court refused to grant a rehearing on plaintiff's Rule 60(b) Motion, case no. 4-11-cv-01038. Plaintiff was asking the Third Circuit Court to set aside the order of the Middle District Court. However, the Rule 60(b) action to resurrect case no.4-11-cv-01038 was dismissed. Instead, estoppelled the plaintiff by applying criminal law, Anti-Terrorism and Effective Death Penalty Act of 1996. A true and correct copy of the February 22, 2021 Opinion and Judgment and Petition for Rehearing dated, April 6, 2021, document is attached hereto as Exhibit JJ.

> "Every person is entitled to an opportunity to be heard in a court of law upon every question involves his rights or interests before he is affected by any judicial decision on the question." _Earle v. McVeigh_, 91 US 503,23 L.Ed 389.

86. The latest undertaking, after the federal courts keep remanding plaintiff's cases back to state courts, on September 15 & 22, 2021, plaintiff filed a Civil Action, Complaint in Mandamus with the Pennsylvania Supreme Court. The plaintiff requested the court for an injunction and have the 1989 Order be given full faith and credit and enforced. A couple days later the plaintiff received the filing fee back from the Pennsylvania Supreme Court Clerks who out right refused to file his Complaint, and informed him he will no longer be able to file his case with the Pennsylvania Supreme Court. If he choses not comply, he will be ignored and will not hear from them any further. . This clerks acted outside of the scope of their duties when they denied the plaintiff access to the Commonwealth's highest court to file his grievance in hopes for justice to prevail. This is in clear violation of the First Amendment of the United States Constitution. A true and correct copy of the document is attached hereto as Exhibit KK.

## Civil Action Allegations

87. Plaintiff, John McCool, brings this action on behalf of himself (pro Se) has made out a prima facie case on the civil rights claim, pursuant to 28 U.S.C. § 1983. To maintain a § 1983 claim, the plaintiff must show that the defense has deprived him of a right or privilege secured by the Constitution or laws of the United States while acting under color of law. *Hicks v. Feeney*, 770 F.2d.375, 377 (3d Cir. 1985). § 1983 is not a source of substantive rights[10] but produces "a method for vindicating federal right elsewhere conferred." *Graham v. Connor*, 499 U.S. 386, 393-94 (1989). Thus, § 1983 does not give rise to "a right to be free of injury wherever the State may be characterized as the tortfeasor," but rather the plaintiff must demonstrate that he was deprived of a federally protected right. *Paul v. Davis*, 424 U.S. 693 (1976). The central issue in determining whether an individual has acted under color of state law is whether the alleged infringement of federal rights is "fairly attributable to the State." Luger v. Edmonds on Oil Co., 457 U.S. 922, 937 (1982). Accordingly, a finding by this Court that the defendants were acting under "color of state law" when this Court finds the Cmwlth's officers and officials deliberately chose to obstruct the NYS's court power by not enforcing the February 27, 1989, Order and not recording it within their state. A finding of the Cmwlth's officers and officials were in contempt of court when they continued on with their trials after February 27, 1989, Order was made, and was directly the cause of plaintiff's current false incarceration in their state. Whether the State officers and officials

---

[10] Are basic human rights, possessed by people in an orderly society and includes rights granted by natural law as well as the substantive law. Substantive rights involve a right to substance of being human (life, liberty, happiness)

were acting under color of law and infringed upon the federal rights of the plaintiff by doing so, and, in doing so, can be fairly attributed to the State when their own officers, officials, who were elected as policymakers, had the final authority in the matters in question of state laws, and sanctioned and partook in the acts found in this Complaint that resulted in them obtaining their illegal sentences and convictions against the plaintiff and misusing and misapplying the AEDPA of 1996 to cover up those illegal activities and to conceal the 1989 Order and have him illegally imprisoned in their Department of Corrections for decades.

88. In determining how the Counties and their municipalities are held liable under § 1983 is acts for which the municipality itself is actually responsible, "that is, acts which the municipality has officially sanctioned or ordered." Only those municipal officials who have "final policymaking authority" may by their actions subject the government to § 1983 liability. Whether a particular official has "final policymaking authority" is a question of state law. The challenged action much have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in that area of the city's business. _St. Louis v. Praprotnik_, 485 U.S. 112, 118 (1988), citing _Pembaur v. Cincinnati_, 475 U.S. 469, 480 (1986). Accordingly, such a "custom" or "policy" would also have to be the catalyst or "moving force" behind plaintiff's false imprisonment and injuries. The plaintiff alleges that there is a municipal "custom" or "policy" of deliberate indifference on the part of the municipalities and the Counties. The Plaintiff has been making his allegations for decades addressing the legal requirements to find the municipalities and the Counties liable for not complying with the "absolute language" of the 1981

Interstate Agreement on Detainers Act the Counties had with NYS, their failure with cooperating with NYS in effectuating its purpose, and for noncompliance of NYS February 28, 1989, Order. The Pennsylvania Supreme Court in *Commonwealth v. Hude*, 483 Pa. 489, 397, A.2d, 772 (Pa. 1979), required all employees of the Commonwealth to enforce the IADA agreement and to cooperate with party states in effectuation its purpose, providing petitioner standing to have the NYS court February 27, 1989, Order enforced.

**Cause of Civil Action**

89. The Cmwlth of PA lost personam and subject matter jurisdiction over the criminal cases (no. CR-81-71 and 142-1980) when: (1) they were prosecuting the plaintiff in two separate jurisdictions at the same time (2) when one jurisdiction relinquished custody to the other jurisdiction while their trial processes was still on going, and (3) when they returned the plaintiff to NYS on June 10, 1981, while the trial processes in both cases were still ongoing.

90. "A court cannot confer jurisdiction where none existed and cannot make a void proceeding valid. It is clear and well established law that a void order can be challenged in any court." *Old Wayne Mut. L. Assoc v. McDonough*, 204 U.S. 8, 27 S. Ct. 236 (1907). "There is no discretion to ignore lack of jurisdiction" *Joyce v. U.S*. 474 2D 215. "Court must prove on the record, all jurisdiction facts related to the jurisdiction asserted." *Latina v. Hopper*, 102 F.2D 188; *Chicago v. New York*, 37 F. Supp. 150. "Thus, where a judicial tribunal has no jurisdiction of the subject matter on which it assumes to act, its proceedings are absolutely void in the fullest sense of the term." *Dillon v. Dillon*, 187 P.27.

91. NO IMMUNITY IF THE JUDGE ACTED WHOLLY WITHOUT JURISDICTION. Judicial

immunity applies even when the judge acts in excess of the judge's jurisdiction, **but**

**not if the judge acts without jurisdiction at all.**

> "[T]he scope of the judge's jurisdiction must be construed broadly where the
> issue is the immunity of the judge. A judge will not be deprived of immunity
> because the action he took was in error, was done maliciously, or was in excess
> of his authority; rather, he will be subject to liability only when he has acted in
> the "clear absence of all jurisdiction." _Stump v. Sparkman_, 435 U.S. 349, 356-57
> (1978) (quoting Bradley v. Fisher, 13 Wall. 335, 351 (1871))."

> "[T]he relevant standard for judicial immunity is whether the judicial official act in
> "the complete absence of all jurisdiction." _Bare v. Atwood_, 204 N. C. App. 310,
> 315 (2010) (quoting _Mireles v. Waco_, 502 U.S. 9, 12 (1991)). "[T]here is a
> fundamental difference between exceeding authority and acting in the complete
> absence of all jurisdiction." I'd. at 316."

> The United States Supreme Court stated that if a court is "without authority its
> judgments and orders are regarded as nullities. They are not voidable, but
> simply void; and form no bar to a recovery sought, even prior to a reversal in
> opposition to them. They constitute no justification; and all persons concerned
> in executing such judgments or sentences, are considered, in law as
> trespassers." _Elliot v. Piersol_, 1 Pet. 328, 340, 26 U.S. 328, 340 (1828) Elliot v.
> Peirsol.

92. In _Imbler v. Pachtman_, 424 U.S. 409 (1976) the Supreme Court extended absolute

immunity to prosecuting attorneys but expressly limited the immunity to the

prosecutor's actions in connection with his advocacy function. After Imbler, a court

must focus on the function the prosecutors performs in order to delineate the

extent of the immunity.

93. According to The American Bar Association's ethical guidance restates and

reinforces the United States Supreme Court's view when they write "The primary

duty of the prosecutor is to seek justice within the bounds of the law, not merely to

convict" and goes on to say that a prosecutor must only serve the public interest,

so they should always act with integrity. They should only pursue appropriate

criminal charges that have the appropriate severity and they should exercise discretion by not pursuing criminal charges except in appropriate circumstances. A prosecutor should always seek to protect the innocent and only to convict the guilty, should always consider the interests of both the victims and the witness, and should respect the legal and constitutional rights of all persons, including defendant and suspects alike. The bottom line is that the prosecutor's duty is not simply to 'win" but to faithfully pursue justice in every case.

94. When the Imbler case was ruled on, the court did not have the plaintiff's case in mind. The plaintiff's criminal cases 142-1980 and CR-81-71 came to a finality in 1989 in plaintiff's favor. The criminal charges in case 142-1980 and CR-81-71 were dismissed with prejudice. In 1989, the plaintiff was granted habeas corpus relief that protected him from any further prosecutions on criminal charges alleged in criminal case 142-1980 and CR-81-71. However, the Cmwlth's district attorney's office prosecutors unlawfully wield their power over the plaintiff and not acted in a fiduciary[11] manner when they continued to prosecute the plaintiff on criminal charges that no longer existed. They were acting contrary to the public's interest when they *ignored* the rule of law[12] and by their noncompliance of a duly-rendered Order, in order to forfeit an innocent man's life for decades.

---

[11] 5 U.S. Code § 3331 - Oath of Office: An individual, except the President, elected or appointed to an office of honor or profit in the civil service or uniformed services, shall take the following oath: "I, AB, do solemnly swear (or affirm) that I will support and defend the Constitution of the United States against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties of the office on which I am about to enter. So help me God." ....

[12] The Rule of law is a principle under which ALL persons, institutions, and entities are accountable to laws that are: publicly promulgated, equally enforced, independently adjudicated, and consistent with international human rights principles.

95. The Imbler case did not explicitly give district attorney's office absolute immunity to prosecutors malfeasance when they got convictions based on criminal charges that were disallowed by law to exist. The district attorney's offices prosecuted the plaintiff <u>outside</u> the bounds of law. Their sole goal was to merely convict him and win at all costs, while they sacrificed the public's interest and justice. They were rewarded with personal gains and professional successes.

96. THE FACT IS — Being there were **no** criminal charges that were punishable by law averred against the plaintiff, while acting outside the bounds of law, and not working as an advocate or in their authoritative capacity and without personam and subject matter jurisdiction, there is nothing to safeguard the prosecutors from having absolute immunity. These acts were committed by average people who used their powerful positions to commit crimes[13] against the plaintiff to get their unlawful convictions[14] to forfeit the plaintiff's life for decades. The Imbler case did not give prosecutors absolute immunity against egregious misconduct such as this.

## United States Constitution, Statutes, Laws, and Constitution of Pennsylvania 42 U.S.C. § 1983

**First Cause of Action**
Violation of the Fourteenth Amendment to the
United States Constitution under 42 U.S.C. § 1983
(Due Process)

---

[13] Crime is defined as an act committed or omitted, in violation of public law, either forbidding or commanding it; a breach or violation of some public right or duty due to a whole community, considered as a community, In its social aggregate capacity, as distinguished from a civil injury. Wilkins v. U.S. (Black's Law Dictionary 2nd Ed) (http://the law dictionary.org)

[14] The United States Supreme Court noted that the "wrong" of an unlawful conviction includes the abstract injustice in the system and may include "results of the conviction." Noting for example, that "civil rights may be effected." *Id* at 512-13 (United States v. Morgan, 346 U.S. 502, 512, 98 L.Ed. 2d 248, 72 S. Ct. 247 (1954) (United States v. Mayer, 235 U.S. 55 69, 59 L.Ed. 2d 129, 35 S. Ct. 16 (1914).

97. Paragraphs 1 through 96 are incorporated herein by reference as if pleaded in full.

98. Pursuant to 42 U.S.C. § 1983, this claim is brought by Plaintiff against the Defendants in their official capacities.

99. Enumerated in paragraphs 12-31 and evidenced in Exhibits A through PP

100. The Constitution guarantees citizens the ability to vindicate their rights in court. All persons requires the government to respect all rights guarantees, and protections afforded by the United States Constitution and all applicable statutes before the government can deprive any person of life, liberty or property. Due process essentially guarantees that a party will receive a fundamentally fair, orderly, and just judicial proceedings.

> "The limitations inherent in the requirements of due process and equal protection of the law extend to judicial as well as political branches of government, so that a judgment may not be rendered in violation of those Constitutional limitations and guarantees." *Hanson v. Denckla*, 357 U.S. 235, 2 L.Ed, 2d 1283, 78 S. Ct. 1228

### Second Cause of Action
Violation of the Fourth Amendment to the
United States Constitution under 42 U.S.C. § 1983
(right of the to be secure in their persons, houses, papers, and effects, against
unreasonable searches and seizures)

101. Paragraphs 1 through 100 are incorporated herein by reference as if pleaded in full.

102. Pursuant to 42 U.S.C. § 1983, this claim is brought by Plaintiff against the Defendants in their official capacities.

103. Enumerated in paragraphs 12-31 and evidenced in Exhibits A through PP

104. The Fourth Amendment is the party for the Constitution that gives the people a right to be secure in their persons, houses, papers and effects against

unreasonable searchers and seizures. The Commonwealth's false imprisonment of the plaintiff in their state correctional institution has made him subjected to the Department of Corrections unreasonable searches and seizures of his person and this property and his cells he makes home. The Department of Corrections has taken the plaintiff's peace of mind. The governments has been intrusive, disrupts his security and tranquility. The district attorney's office has had their influence and powers extend into the facility by commanding the Department of Corrections to assign the plaintiff a high security H-code to have access to the plaintiff's property, to harass him and subject him to violent criminals and transferring him every few months to different cells. This is despite the fact that the plaintiff is 69-years-old.

### **Third Cause of Actions**
Violation of the Fourteenth Amendment to the
United States Constitution under 42 U.S.C. § 1983
(Equal Protection)

105.Paragraphs 1 through 104 are incorporated herein by reference as if pleaded in full.

106.Pursuant to 42 U.S.C. § 1983, this claim is brought by Plaintiff against the Defendants in their official capacities.

107.Enumerated in paragraphs 12-31 and evidenced in Exhibits A through PP

108.Under the equal protection clause of the 14th Amendment. "The purpose is to secure every person within the state's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Willowbrook v. Olech*, 528 U.S. 1073 (2000), 120 S. Ct. 1073, 1074-75 (2000) (per curiam) (quoting *Sioux City Bridge Co., v. Dakota County*, 260 U.S. 441, 445 (1923)).

109.A standard for 'Class of One" claims under the equal protection clause of the fourteenth amendment: Protecting victims of non-class based discrimination from vindictive state action. Individuals who have been victimized by a state or local officials, but who do not have a claim under a traditionally recognized Equal Protection category, can file in a federal court under 42 U.S.C. § 1983.

## Fourth Cause of Action
Violation of the Eight Amendment and Eleventh Amendment to the
United States Constitution under 42 U.S.C. § 1983
(Cruel and Unusual Punishment)

110.Paragraphs 1 through 109 are incorporated herein by reference as if pleaded in full.

111.Pursuant to 42 U.S.C. § 1983, this claim is brought by Plaintiff against the Defendants in their official capacities.

112.Enumerated in paragraphs 12-31 and evidenced in Exhibits A through PP

113.The plaintiff is not bound in a relationship of owing a debt to society when the district attorneys wrongfully imprisoned him (for decades) on criminal charges that don't lawfully exist. The Thirteenth (XIII) Amendment to the United States Constitution protects the plaintiff against being forced into involuntary servitude and peonage,[15] and furthermore, the Cmwlth officers and officials used fraud to force the plaintiff into human trafficking by subjugating him into their Department of Corrections and coercing him to provide them his labor and services to make gross profits while refusing to compensate him minimum wage so he could support himself. The plaintiff was compensated for his labor and service to what amounts to a few cents per hour, thus, making him a pauper. The Cmwlth's officers and

---

[15] Peon usually refers to a person subjected to peonage: any form of wage labor in which a laborer (peon) has little control over employment conditions.

officials used psychological and physical means to coerce the plaintiff into his compliance.

114. The Defendants are responsible for victimizing, oppressing, tormenting, humiliating and degrading the plaintiff by subjecting him to body cavity searches. The Commonwealth's correctional officers ridicule and humiliate the plaintiff as they do. They have traumatize him on a regular basis and by these correctional officers every day. These unlawful sentences the Defendants illegally obtained and fraudulently begotten has subjected the plaintiff to cruel and unusual punishment and kidnapped him in their penal system and these correctional officers are endangering his health and wellbeing for decades.

115. The Department of Corrections destroyed plaintiff's medical records. The Plaintiff had suffered at the hands of the Cmwlth's officers and officials back in 1990 when they kidnapped the Plaintiff from New York State to continue on with their unlawful prosecution of the plaintiff that got their illegal convictions based on those criminal charges that were dismissed by the NYS judge's 1989 Order. Currently has the plaintiff held against his will that is on going to this day. The Cmwlth's law enforcement officers threw him downstairs and ruptured his diaphragm. The law enforcement officers had the plaintiff in chains and as he climbed the courthouse staircase, the law enforcement officer jerked up on the chains and the plaintiff fell down the staircase, ended up upside down, with his back against the wall. He immediately felt immense pain, and they took the plaintiff to the Northumberland County jail basement and four-pointed him to a bed and pumped him with cortisol to help him sleep at night. Later the plaintiff need surgery to repair his diaphragm to

41

correct the damage and the plaintiff developed a mass and diagnosed with an esophageal stricture. When the plaintiff went through surgery to repair his diaphragm, he had over 90 metal staples. He ended up getting an infection and got cellulitis and some of the metal staples were not removed. In 2001, the plaintiff was at SCI-Pittsburgh and put on a waiting list to have have those missing metal staples removed and get more corrective surgery, however the prison closed down before he could get the surgery. By the time he was transferred to SCI-Fayette the plaintiff's medical records were either lost, misplaced or destroyed. This prevented the medical staff at Fayetteville from following through with the corrective surgery at the Pittsburgh Medical Center. The incision and the damage was what the plaintiff based his case on when he sued the Department of Corrections, however, he lost his lawsuit. 2008 or 2009 there was an opinion filed by the Cmwlth court, This incision was proved the plaintiff's case. The court did not appoint an outside doctor to examine the plaintiff. Instead, the court claimed it was obligated to accept the Department of Correction's record of events and the record did not support the plaintiff's allegations. Although, in 2007, Dr. Anderson out of Kane Community Hospital in Kane, PA, provided the prison at SCI-Forest with a record proving his case, however, it was overlooked by the court. The plaintiff suffering is still on going. The incision never healed. The plaintiff read an article about post operative surgeries and notice how much it reflects what has been going through since his initial operation. The unrecovered staples have never been recovered by plaintiff's body due to the negligence of the Department of Corrections.

116. Furthermore, the esophageal stricture that has developed from the cortisol injections, has inhibited the plaintiff from being able to eat certain sized morsels of food due to it getting stuck in his throat that causes fluid buildup. This condition jeopardizes his life on a daily basis. The DOC prescribed a special diet to help prevent this from happening, however, the prison stopped. Through documentation, can be proven how the Department of Corrections has been directly responsible of almost killing the plaintiff by depriving him adequate medical attention that cause him to drown on his own fluids. The DOC officers and officials at the very last moment transferred him to a civilian hospital to get the food surgically removed.

117. The plaintiff can prove to the court that the Cmwlth's Department of Corrections no longer have his medical records . Through discovery phase, the plaintiff can prove what happened in 1990 when he filed a lawsuit of being thrown down the flight of stairs. He can prove that the PA DOC officers and officials attempted to perform unnecessary medical procedures that would have taken his life or interfere with his quality of life, placing him in the same cell with prisoners who have COVID-19, subjecting him to three cans of mace that almost killed him, they subject him to finger penetration of his body cavity while they ridicule, humiliate and laugh at him. Due to his unwillingness to give up his fight for justice, they have "H" coded him to punish, harass and torment him so they can do illegal searches of his property on a regular basis, and keep transferring him from cell to cell disrupting his peace of mind and sense of stability. The plaintiff is now 69-years-old, and by law classifies him as an elderly man, which gives him certain protections, however, they refuse to

allow him a "Z" code where he could be housed in a single celled, instead intentionally subjecting him with inmates who jeopardizes his safety on a daily.

118. The cruel and unusual treatment is so extensive that through the discovery phase can get all the documentation needed to show the court the horrendous nightmare these Cmwlth's officers and officials has put the plaintiff through, intentional acts that is still ongoing to this very day.

119. NONE OF THIS WOULD HAD HAPPENED HAD THE CMWLTH OF PA OFFICERS AND OFFICIALS COMPLIED AND RECORDED THE NYS JUDGE'S FEBRUARY 27, 1989, ORDER IN THE CMWLTH. AN ORDER THAT DISMISSED THE CMWLTH'S CRIMINAL CHARGES AGAINST THE PLAINTIFF WITH PREJUDICE AND GRANTED HIM A HABEAS CORPUS THAT PREVENT THEM FROM FUTURE PROSECUTIONS BASED ON THOSE EXACT SAME CRIMINAL CHARGES.

### Fifth Cause of Action
Violation of Article IV § I of the
United States Constitution under 42 U.S.C. § 1983
(Full Faith and Credit Clause)

120. Paragraphs 1 through 119 are incorporated herein by reference as if pleaded in full.

121. Pursuant to 42 U.S.C. § 1983 and 28 USC § 1738 this claim is brought by Plaintiff against the Defendants in their official capacities.

122. Enumerated in paragraphs 12-31 and evidenced in Exhibits A through PP

123. The Commonwealth's officials and officers were obligated to apply full faith and credit to the NYS court Order, dated February 27, 1989, and mandated to record it in their state under *Mills v. Duryee*, 11 US 7 Cranach 481, 481 (1813) **"and it is beyond all doubt that the judgment of the Supreme Court of New York was**

44

conclusive upon the parties in that state. It must, therefore be conclusive here." (emphasis added) and *Hopkins v. Lee,* 19 US 6 Wheat, 109, 109 (1821) "A judgment or decree of a court of competent jurisdiction is conclusive wherever the same matter is again brought in controversy." but they chose not to.

### Sixth Cause of Action
Violation of Article I, § 9, Clause 3
United States Constitution under 42 U.S.C. § 1983
(Ex Post Facto)

124. Paragraphs 1 through 123 are incorporated herein by reference as if pleaded in full.

125. Pursuant to 42 U.S.C. § 1983 this claim is brought by Plaintiff against the Defendants in their official capacities.

126. Enumerated in paragraphs 12-31 and evidenced in Exhibits A through PP

127. The Commonwealth did not appeal the NYS judge's decision. This order was final in 1989. Making all matters relating to criminal case numbers: 142-1980 and CR-81-71 "res judicata" and his criminal cases concluded in the plaintiff's favor. The retroactivity of the Antiterrorist Effective Death Penalty Act (AEDPA) of 1996 to the matters relating to the February 27, 1989, has changed the legal consequences of the actions that were committed and relationships that existed before the enactment of the AEDPA. The Cmwlth of PA law enforcement officers were able to conceal the Commonwealth's violations of the Constitution, violation of the the Interstate Agreement on Detainers Act (IADA), Article IV's "anti-shuttling" clause, and the February 27, 1989, Order that existed seven (7) years before the AEDPA came into existence. The Commonwealth's failure to record this judgment in their state resulted in the plaintiff held against his will in their state's correctional institution.

## **Seventh Cause of Action**
Violation of Fifth Amendment of the
United States Constitution under 42 U.S.C. § 1983 & Pa. Constitution § 10
(Double Jeopardy)

128. Paragraphs 1 through 127 are incorporated herein by reference as if pleaded in full.

129. Pursuant to 42 U.S.C. § 1983 this claim is brought by Plaintiff against the Defendants in their official capacities.

130. Enumerated in paragraphs 12-31 and evidenced in Exhibits A through PP

131. The United States Supreme Court has held that the double jeopardy clause prevents states from reopening cases which have been conclusively decided by the courts of another state.

132. NYS court concluded the criminal cases in plaintiff's favor and dismissed all the criminal charges with prejudice and granted him habeas relief against them. The Commonwealth kept the prosecution going and convicted the plaintiff, while in absentia, on these exact same charges that no longer were in effect.

## **Eighth Cause of Action**
Violation of Sixth Amendment of the
United States Constitution under 42 U.S.C. § 1983
(Assistance of Counsel)

133. Paragraphs 1 through 132 are incorporated herein by reference as if pleaded in full.

134. Pursuant to 42 U.S.C. § 1983 this claim is brought by Plaintiff against the Defendants in their official capacities.

135. Enumerated in paragraphs 12-31 and evidenced in Exhibits A through PP

136. The Plaintiff did not have effective assistance of counsel. The public defenders office were not acting in the best interest of the plaintiff. He did not even got the

46

minimal representation that the law requires by the public defenders office. He was sacrificed for the advanced of their careers, as the documented evidence shows.

137. Ineffective Assistance of Counsel ("IAC"): The United States Constitution guarantees a criminal defendant the assistance of counsel in the representation of his defense. However the mere fact that a lawyer is present .. does not. in and of itself, qualify as assistance. *Strickland v. Washington*, 466 U.S. 668, 685 (1984) ("That a person who happens to be a lawyer is present in trial alongside the accused, however, is not enough to satisfy the constitutional command.")

138. The United States Supreme Court has held that: "the right to counsel is the right to effective assistance of counsel." and it further states that "the purpose of the effective assistance guarantee... is not to improve the quality of legal representation [and] is simply to ensure that criminal defendants receive a fair trial.

139. The United States Supreme Court has also recognized a constitutional right to effective assistance of counsel on direct appeal, although the right is under the Due Process Clause, rather than the Sixth Amendment. *Evitts v. Lucey*, 469 U.S. 387 (1985)

140. Violated the U. S. Constitutional Amendment: VI, "In all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence."

> Ineffectiveness Assistance of Counsel (IAC): *Commonwealth v. Williams*, 732 A.2d 1167, 1177 (Pa 1999). To succeed on a claim of ineffectiveness assistance of counsel, Appellant must demonstrate that (1) the underlaying claim is of arguable merit; (2) counsel's performance lacked a reasonable basis; and (3) the ineffectiveness of counsel caused the appellant prejudice.

### Ninth Cause of Action
Violation of the First Amendment of the

United State Constitution under 42 U.S.C. § 1983
(The right to petition)

141.Paragraphs 1 through 140 are incorporated herein by reference as if pleaded in full.

142. Pursuant to 42 U.S.C. § 1983 this claim is brought by Plaintiff against the Defendants in their official capacities.

143.Enumerated in paragraphs 12-31 and evidenced in Exhibits A through PP

144. A First Amendment Right of Access to the Courts for Indigents. The Commonwealth labeled the plaintiff as a "serial petitioner" which created severe bias and prejudice in the Commonwealth's judicial system. The due diligence the plaintiff engaged in trying to correct this egregious miscarriage of justice was used against him. This prejudice and bias has reached the Pennsylvania's Supreme Court. The clerk written him a scathing letter telling him they will not allow him to file a case with that court, even though he submitted the required fees. If he does, he will be ignored and nothing will not be sent back to him, denying him his right to petition the courts.

### Tenth Cause of Action
The Antiterrorism and Effective Death Penalty Act of 1996
(Pub. L. No. 104-132, 110 Stat. 1214 (aka AEDPA))
violations under 42 U.S.C. § 1983

145.Paragraphs 1 through 144 are incorporated herein by reference as if pleaded in full.

146.Pursuant to 42 U.S.C. § 1983 this claim is brought by Plaintiff against the Defendants in their official capacities.

147.Enumerated in paragraphs 12-31 and evidenced in Exhibits A through PP

148. The AEDPA of 1996 was not intended by Congress to sharply curtail the right of state inmates, under federal habeas, to challenge their state convictions based on a final order made seven years before the AEDPA of 1996 became law.

149. The Defendants used the AEDPA of 1996 to subvert the integrity of the judicial process.

150. The Cmwlth of PA used it as a "safe haven" to keep the plaintiff from challenging the Commonwealth's convictions. Northumberland County did not have to explain the reason why they sealed up criminal case no. CR-81-71, placing them under lock and key. Snyder County did not have to explain (1) why their criminal case no.142-1980 official record was not complete, (2) why it is missing important facts and information and (3) contains trivial handwritten which is against the notes, (4) why the record contains type print and handwritten, (5) why the record is not in chronological order, (6) why it looks like the record has been cut and pasted together, (7) why the type is extremely small to make is almost unreadable, (8) how did the record end up so botched, and (9) Why it appears to have been tampered with? (10) How can the Commonwealth officers and officials be able to use Snyder County's official record be used against the plaintiff when it egregiously violates 234 Pa. Code Rule 113 and hid the truth as to what occurred in criminal case number 142-1980? (11) Why does the criminal case number 142-1980 not contain all the facts that were in plaintiff's favor and which would have gotten him his release from prison? (12) How can Northumberland County officers and officials feel it was necessary to have criminal case number CR-81-71 sealed away from public view and from the eyes of the judges in appellate courts when they knew

would prevent the plaintiff the ability to successfully challenge his criminal convictions and would have gotten him released from prison? Furthermore, why both Northumberland County and Snyder County gave two different accounts as to what happened since plaintiff's transfer to the Cmwlth of PA jurisdiction in 1981? Why both counties simultaneously prosecuted the plaintiff? How both counties had subject matter jurisdiction and jurisdiction over the plaintiff? How was it possible both Counties can have subject matter jurisdiction and personal jurisdiction over the plaintiff while he was residing in NYS? What section of law allowed them to keep prosecuting the plaintiff when the IADA, Art IV forbid it once plaintiff was sent back to NYS? There are so many more questions the plaintiff and this Court needs to be answered. The Defendants unconstitutionally claims the plaintiff and the courts are estoppelled by the AEDPA of 1996, precluding them the obligation to answer any and all questions we may have relating to criminal cases 142-1980 and CR-81-71.

### Eleventh Cause of Action
Violation of the Separation of Powers
Doctrine of the Pennsylvania Constitution
under 42 U.S.C. § 1983

151. Paragraphs 1 through 150 are incorporated herein by reference as if pleaded in full.

152. Pursuant to 42 U.S.C. § 1983 this claim is brought by Plaintiff against the Defendants in their official capacities.

153.Enumerated in paragraphs 12-31 and evidenced in Exhibits A through PP

154. The Commonwealth secured an Executive Agreement with two state governors by being indifferent to the "separation of powers principles." The Commonwealth circumvented the New York's judicial decision made in 1989 that dismissed their criminal charges for violating the IADA, Art. IV (e) "anti-shuttling" clause by illegally went "forum shopping" because the Commonwealth officials did not like the NYS judicial branch terminating their criminal charges denying them extradition of the plaintiff, instead, they pursued an executive branch remedy to unlawfully obtain custody, kidnapping plaintiff, taking him across state lines, and followed through with their scheme in getting their unlawful convictions.

## Twelfth Cause of Action
Violation of 5 CFR § 2635.101
(Basic Obligation of Public Service)
under 42 U.S.C. § 1983

155. Paragraphs 1 through 154 are incorporated herein by reference as if pleaded in full.

156. Pursuant to 42 U.S.C. § 1983 this claim is brought by Plaintiff against the Defendants in their official capacities.

157. Enumerated in paragraphs 12-31 and evidenced in Exhibits A through PP

158. The Defendants committed malfeasance of public trust in the way the Commonwealth prosecuted the plaintiff. Each employee has a responsibility to the U.S. Government and its citizens to place loyalty to the Constitution, laws, and ethical principles above private gain. To ensure every citizen can have complete confidence in the integrity of the Federal Government, each employee shall respect and adhere to the principles of ethical conduct..."

## Thirteenth Cause of Action
Violation of 18 USCS, App § 2, Art. IV

## (Interstate Agreement on Detainers Act)
### under 42 U.S.C, § 1983

159. Paragraphs 1 through 158 are incorporated herein by reference as if pleaded in full.

160. Pursuant to 42 U.S.C. § 1983 this claim is brought by Plaintiff against the

Defendants in their official capacities.

161. Enumerated in paragraphs 12-31 and evidenced in Exhibits A through PP

162. Defendants deliberately misuse (misapplication of law) of 18 USCS Appx. to indict

plaintiff and bring him to Pennsylvania,

163. If the prisoner is returned to the original jurisdiction, any pending charges, which

have not been finally prosecuted, must be dismissed with prejudice.

*Commonwealth v. Diggs*, 416 A.2d 1119 (1980). The fact is that the Cmwlth of PA

officers and officials returned the plaintiff to NYS on June 10, 1981, BEFORE both

trial processes were final [criminal case numbers 142-1980 and CR-81-71] As of

June 10, 1981, the IADA, Art. IV (e) mandated that those criminal charges to be

dismissed with prejudice and no longer have any force or effect over the plaintiff.

Instead, the Cmwlth of PA officials and officers kept on prosecuting the plaintiff

while in absentia and in 1988 requested an impermissible second (2nd) IADA, Art.

IV with NYS to obtain custody of the plaintiff.

164. The United States Supreme Court made it clear the anti-shuttling provision must

be strictly construed based on the IADA's "absolute language," *Alabama v.*

*Bozeman*, 553 U.S. 146,156 (2001), Even a "one-day violation" of the statute is not

"de minimis, technical, or harmless," Id, A violation of the anti-shuttling provides a

prisoner with an "absolute defense" on the underlying indictment. *United States v. Williams*, 615 F.2d 585, 589 (3rd Cir. 1980).

165. The United States Court held that "the language of the Agreement militates against an implicit exception, for it is absolute" There is no de minimis exception to Article IV(e) and dismissal is required if the provision is violated. *Alabama v. Bozeman*, 121 S. Ct. 2079 (2001).

166. Due to the Cmwlth's noncompliance of the IADA, Art. IV caused the plaintiff to have his rehabilitation programs taken away from him and lost the benefits those programs provided him and he was also denied his right to be allowed to continue attending UCCC where his goal was to graduate and get his Associates Degree.

### Fourteenth Cause of Action
Violation of 18 U.S. Code § 241
(Conspiracy against rights)
under 42 U.S.C. § 1983

167. Paragraphs 1 through 166 are incorporated herein by reference as if pleaded in full.

168. Pursuant to 42 U.S.C. § 1983 this claim is brought by Plaintiff against the Defendants in their official capacities.

169. Enumerated in paragraphs 12-31 and evidenced in Exhibits A through PP

170. The Cmwlth of PA public defenders office, the judges, the prosecutors from Snyder County and Northumberland County —- ALL of them —- had engaged in conspiring together to deprive the plaintiff of his rights, as the attached Exhibits has proven.

### Fifteenth Cause of Action
Violation of 18 U.S. Code § 242
(Deprivation of rights under color of law)

under 42 U.S.C. § 1983

171. Paragraphs 1 through 170 are incorporated herein by reference as if pleaded in full.

172. Pursuant to 42 U.S.C. § 1983 this claim is brought by Plaintiff against the Defendants in their official capacities.

173. Enumerated in paragraphs 12-31 and evidenced in Exhibits A through PP

174. The Federal Criminal Statute that enforces Constitutional limits on conduct by law enforcement officers is 18 U.S.C. § 242. It provides in relevant part: "Whoever, under the color of any law... willfully subject any person... to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States [shall be guilty of a crime] § 242 is intended to protect all persons in the United States in their civil rights and furnace the means of their vindication. *Screws v. United States*, 325 US 91, 98 (1945) (quoting legislative history).

### Sixteenth Cause of Action
25 CFR § 11.448
(Abuse of office)
under 42 U.S.C. § 1983

175. Paragraphs 1 through 174 are incorporated herein by reference as if pleaded in full.

176. Pursuant to 42 U.S.C. § 1983 this claim is brought by Plaintiff against the Defendants in their official capacities.

177. Enumerated in paragraphs 12-31 and evidenced in Exhibits A through PP

178. A person acting or purporting the act in an official capacity or taking advantage of such actual or purported capacity commits a misdemeanor if, knowing that his or conduct is illegal, he or she: (a) Subjects another to arrest, detention, search, seizure, mistreatment, dispossession, assessment, lien or other infringement of

personal or property rights; or (b) Denies or impedes another in the exercise of enjoyment of any right, privilege, power or immunity.

### Seventeenth Cause of Action
Violation of Pennsylvania Constitution § 26
under 42 U.S.C. § 1983
(civil rights)

179. Paragraphs 1 through 178 are incorporated herein by reference as if pleaded in full.

180. Pursuant to 42 U.S.C. § 1983 this claim is brought by Plaintiff against the Defendants in their official capacities.

181. Enumerated in paragraphs 12-31 and evidenced in Exhibits A through PP

182. The Commonwealth has denied the plaintiff the enjoyment of his civil rights that every American enjoys and takes for granted. The Cmwlth of PA has maliciously attacked and victimized the plaintiff in exercising of his civil rights and denied him the human experience (like love, relationships, family, and freedom of choices, travel, food, etc)

### Eighteenth Cause of Action
Violation of Pennsylvania Constitution § 1
under 42 U.S.C. § 1983

183. Paragraphs 1 through 182 are incorporated herein by reference as if pleaded in full.

184. Pursuant to 42 U.S.C. § 1983 this claim is brought by Plaintiff against the Defendants in their official capacities.

185. Enumerated in paragraphs 12-31 and evidenced in Exhibits A through PP

186. The plaintiff was denied his substantive right of life, liberty.

### Nineteenth Cause of Action
Violation of Pennsylvania Constitution § 9

under 42 U.S.C. § 1983

187.Paragraphs 1 through 186 are incorporated herein by reference as if pleaded in full.

188.Pursuant to 42 U.S.C. § 1983 and 28 USC § 1738 this claim is brought by Plaintiff

against the Defendants in their official capacities.

189.Enumerated in paragraphs 12-31 and evidenced in Exhibits A through PP

190.the accused cannot be deprived of his life, liberty or property, unless by the

judgment of his peers or the law of the land.


### Twentieth Cause of Action
Violation of Pennsylvania Common Law
(public may inspect and copy judicial records)
under 42 U.S.C. § 1983

191.Paragraphs 1 through 190 are incorporated herein by reference as if pleaded in full.

192.Pursuant to 42 U.S.C. § 1983 and 28 USC § 1738 this claim is brought by Plaintiff

against the Defendants in their official capacities.

193.Enumerated in paragraphs 12-31 and evidenced in Exhibits A through PP

194.The defendants had no justification in sealing the judicial records in criminal case

number CR-81-71. The defendants did not want the public or the appellate courts

to have access to these records to prevent them from inspecting, scrutinizing and

allow the plaintiff the ability to challenge the legality of his incarceration.


### Twenty-first Cause of Action
Violation of 18 Pa. C. S. § 3921(a)
under 42 U.S.C. § 1983
(theft by unlawful taking or disposition)

195.Paragraphs 1 through 194 are incorporated herein by reference as if pleaded in full.

196. Pursuant to 42 U.S.C. § 1983 and 28 USC § 1738 this claim is brought by Plaintiff against the Defendants in their official capacities.

197. Enumerated in paragraphs 12-31 and evidenced in Exhibits A through PP

198. A federal court judge ordered the Department of Corrections to release plaintiff's records to him but refused.

199. The Cmwlth of PA Department of Corrections is guilty of theft by unlawful taking or disposition of plaintiff's property. After the defendants noncompliance with the judge's order to relinquish the property to the plaintiff, makes the defendants guilty of theft by unlawfully taking, and exercising unlawful control over plaintiff's moveable property with the intent to deprive him of them. This unlawful act caused damage the Plaintiff. It denied him his right to defend himself in court. This intentional act helped the Commonwealth's officials and officers to hide their substantive law violations and violations under 42 U.S.C. § 1983.

## COUNTS
## CAUSE OF ACTION - INJURIES

### COUNT I - 42 U.S.C. § 1983 STATE CREATED DANGER
### (by Plaintiff against all the Commonwealth's Defendants)

200. 1 through 199 are incorporated herein by reference, as though each were duly set forth herein at length.

201. Defendants were responsible for providing plaintiff all the protections every citizen of the United States is entitled under the rule of law.

202. It is believed and averred that defendants were aware that they were wrong to inflict punishment upon a citizen who they knew or who they should have known whose incarceration stemmed from criminal charges that were terminated in his

57

favor by the terms of a 1981 Interstate Agreement on Detainers (IAD) Agreement; by the terms of the 1983 Superior Court Judgment, see *Commonwealth v. McCool*, 457 A.2d 1312 (Pa.Super.1983) (See Exhibit NN); and by a New York Habeas Court's decision granting plaintiff habeas relief under New York Criminal Law § 580.00 et seq., identical to Pennsylvania law 19 P.S. § 1431 et seq., requiring Pennsylvania to dismiss all criminal charges as it agreed to do by the terms of the 1981 Art. IV (IAD) Agreement. The Commonwealth's prosecutors deliberately, recklessly and maliciously failed to correct the unlawful incarceration and/or take any other reasonable precautions to prevent the unlawful incarceration from harming the plaintiff.

203. Defendants failures, acts, and omissions violated plaintiff's civil rights, by increasing plaintiff's risk of harm he otherwise would not have experienced had they complied with the laws of the United States and the Commonwealth. They directly caused the foreseeable injuries to plaintiff.

204. WHEREFORE, pursuant to 42 U.S.C. § 1983, plaintiff demands compensatory and punitive damages against the defendants jointly and/or severally, in the amount $10,000.00 for each of the days he has been incarcerated based on criminal charges that were a legal nullity, plus interest, costs, attorney's fees and delay damages.

### COUNT II - U.S.C. § 1983  POLICY, CUSTOM, PATTERN, AND PRACTICE
### (by Plaintiff against all the Commonwealth's Defendants)

205. Paragraphs 1 through 204 are incorporated herein by reference, as though each were duly set forth herein at length.

206. Damages for failing to enforce a duly recorded compact agreement between Pennsylvania and New York, and for noncompliance with the terms of the compact agreement transacted in 1981 under the (IAD) Act, Art. IV. In this compact agreement, the Commonwealth agreed to dismiss all criminal charges if plaintiff was returned to New York before the criminal charges against him were finally disposed of. When the Commonwealth did prematurely return the plaintiff to NYS they continued on prosecuting the plaintiff in absentia.

207. Damages for failing to enforce a duly recorded March 25,1983, judgment of the Pennsylvania Superior Court that vacated the plaintiff's criminal case based on the claim of ineffective assistance of trial counsel.

208. Damages for the Commonwealth not recording the February 27, 1989, New York Habeas Court's order with their state. This intentional act caused the plaintiff great harm in the state's appellate courts. This act created great bias and prejudice in their judicial system. It prevented the plaintiff from being successful in correcting this egregious miscarriage of justice and it has allowed the Commonwealth to permanently estoppel the plaintiff by using the AEDPA of 1996. The Plaintiff is now permanently banned from filing any grievances relating to this case with the Pennsylvania Supreme Court .

209. The plaintiff has been exercising due diligence in redressing this miscarriage of justice for decades. Due to the plaintiff's persistence, the Defendants punished and damaged the plaintiff by creating extreme bias and prejudice by influencing the courts in them labelling, condemning and stigmatizing the plaintiff as a "serial petitioner" alleging and making it appear his filings were frivolous. When in truth

59

and according to the laws of the land, he had merit and a legal right as to what he was asking the courts to do.

210. Damages for their failure to implementing a policy to appropriately use the Antiterrorism and Effective Death Penalty Act (AEDPA). The Commonwealth knowingly and intentionally did not record the NYS 1989 Order within their state. By doing so, they used this Act as a way to enforce the unlawful, fraudulently begotten convictions, causing the AEDPA's presumption of correctness clause to sanction the defendants unlawful state court criminal convictions.

> "Fraud upon the court has been defined by the 7th Circuit Court of Appeals to "embrace that species of fraud which does, or attempts to defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication." *Kenner v. C.I.R.* 387, F.3d 689 (1968) 7 Moore's Federal Practice, 2d.Ed p, 512 ¶ 60.23 (The 7th Circuit further stated "a decision produced by fraud upon the court is not in essence a decision at all, and never becomes final.")

211. WHEREFORE, pursuant to 42 U.S.C. §§ 1983 and 1988, plaintiff demands compensatory and punitive damages that would be just and proper under the circumstances, plus interest, cost, attorney's fees and delay damages as well as a declaratory judgment and injunctive relief clarifying the AEDPA's defects not previously recognized ... enabling prosecutors to have their unlawful criminal convictions to go unchallenged whereby depriving an incarcerated person of his first amendment right of access to the courts and the equal protection of the laws guaranteed to him by the U.S. Constitution.

**COUNT III- 42 U.S.C. § 1983  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.   (by Plaintiff against all Commonwealth's Defendants)**

212. Paragraphs 1 through 211 are incorporated herein by reference, as though each were duly set forth herein at length.

213. Defendants were responsible for providing the plaintiff equal protection of the law and his first amendment right of access to the courts.

214. It is believed and averred that the defendants were aware that they were not providing the plaintiff equal protection of law and/or adequate access to the courts guaranteed to him by the first amendment. They willfully, deliberately, recklessly, maliciously and intentionally weaponized the legal system to prevent the plaintiff from leaving prison. Their actions were extreme and outrageous. These actions were the proximate cause of the emotional distress plaintiff has had to go through for four (4) decades.

215. WHEREFORE, pursuant to 42 U.S.C. § § 1983 and 1988 plaintiff demands compensatory and punitive damages allowable under the rule of law, plus interest, cost, attorneys fees, and delay damages.

## COUNT IV - 42 U.S.C. § 1983 DELIBERATE INDIFFERENCE (by Plaintiff against all Commonwealth's Defendants)

216. Paragraphs 1 through 215 are incorporated herein by reference, as though each were duly set forth herein at length.

217. It is believed and averred that the defendants were aware of their obligations under the rule of law concerning their 1981 Art.IV (IAD) Agreement; the 1983 Superior Court Judgment granting plaintiff's appeal; and the 1989 New York Habeas Court's order granting him habeas relief. Yet in spite of this the defendants went ahead with obtaining an executive order to extradite plaintiff as a witness in 1990 knowing they

were wrong for exercising jurisdiction over a case and matter that pursuant to the rule of law had already been terminated in the plaintiff's favor.

218. The defendants were aware that they were to dismiss their criminal charges in 1981 when they violated the "anti-shuttling" clause when they returned the plaintiff back to NYS while the trial processes were still taking place. The deliberate indifference they had to the "absolute language" of the IADA, Art. IV, has caused severe damage and harm to the plaintiff.

219. WHEREFORE, pursuant to 42 U.S.C. §§ 1983 and 1988, plaintiff demands compensation and punitive damages for the deliberate indifference shown by the defendants that caused so much emotional distress, mental anguish, or humiliation.

## COUNT V - 42 U.S.C. § 1983 FRAUD UPON THE COURT, CONSPIRACY AGAINST RIGHTS OF CITIZENS, HUMAN RIGHTS ABUSE, DEPRIVATION OF RIGHTS UNDER COLOR OF LAW (by Plaintiff against all Commonwealth's Defendants)

220. Paragraphs 1 through 219 are incorporated herein by reference, as though each were duly set forth herein at length.

221. This case and matter cannot be pursued effectively if venue does not remain in the Northern District Court of New York.

222. It is believed and averred that the defendants will continue to deny that there was a connection between the aforementioned New York Habeas Court's order and Pennsylvania's unlawful pursuant of criminal charges that were no longer of any force or effect over the plaintiff due to the terms of the 1981 Art. IV (IAD) Agreement Pennsylvania had with New York. The defendants will continue to conspire against the rights of the plaintiff and deprive him of his rights under color of law.

223.The only way this case and matter can be free of the subterfuge that prevented this case and matter from being litigated in Pennsylvania is to eliminate the fraud that kept the facts from coming to light in Pennsylvania showing the wrongs that were perpetrated or perpetuated by the defendants and the unlawful and undue means by which the Pennsylvania prosecutors obtained their criminal convictions.

224.Venue must remain in Northern District Court of New York because its the only venue that will provide the plaintiff the equal protection of the law and/or adequate access to the courts guaranteed to him by the first amendment.

225.WHEREFORE, pursuant to 42 U.S.C. §§ 1983 and 1988 and based on the defendants willful, deliberate, malicious and intentional disregard of the truth, there were damages to the plaintiff and currently ongoing damages for which plaintiff demands compensatory and punitive damages for as well as any and all declaratory judgments or injunctions allowable under the rule of law that will return the plaintiff to the position he would have been but not for the fraud. VENUE must remain where the order in question was rendered to avoid the fraud previously perpetrated or perpetuated by the defendants who kept the facts of this case and matter from coming to light in order to preserve their unlawful convictions.

### COUNT VI - 42 U.S.C. § 1983 MALICIOUS PROSECUTION, WRONGFUL CONVICTION (by Plaintiff against all Commonwealth's Defendants)

226.Paragraphs 1 through 225 are incorporated herein by reference, as though each were duly set forth herein at length.

227.This case and matter cannot be pursued effectively if venue does not remain in the Northern District Court of New York.

228. It is believed and averred that the defendants maliciously prosecuted the plaintiff. The defendants abused of the criminal justice system by targeting an innocent man. The defendants maliciously prosecuted the plaintiff despite the lack of evidence of guilt for the crimes in question. The prosecutors pursuing criminal charges were done with malice despite the lack of incriminating evidence.

229. The plaintiff demonstrated in paragraphs 12-31 (1) the defendants initiated the criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor, (3) the proceeding was initiated without probable cause; and (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice." *Hilfirty v. Shipman*, 91 F.3D 573, 579 (3d Cir.1996) (citing *Haefner v. Burkey*, 626 A.2d 519, 521 (Pa, 1993).

230. Venue must remain in Northern District Court of New York because its the only venue that will provide the plaintiff the protection of the law and/or adequate access to the courts guaranteed to him by the first amendment.

231. Venue must remain in the Northern District Court of New York because the Commonwealth's federal and state courts have a conflict of interest where there is a coexisting interest that is in a direct conflict with each other relating to plaintiff's criminal cases. Their decision-making process has been disrupted and compromised by the Commonwealth's officers and officials' corruption, unscrupulousness, and treachery in how Commonwealth's officers and officials prosecuted the plaintiff and not recording the February 27, 1989 NYS court Order in their state, and concealment of the 1981 IADA, Art IV agreement they had with NYS. This has lead to the egregious miscarriage of justice that has lasted for

decades. The Commonwealth's state and federal courts refuses to take plaintiff's evidence to correct their official records to reflect the truth. All the their courts decision-making always benefits the Commonwealth officers and officials. They have long established their loyalty to Commonwealth's officers and officials as Exhibit LL has proven to this Court. They remain steadfast in not upholding the United States Constitution (like applying full faith and credit to the 1989 NYS Court), preserving the integrity of the court system, and stand up for truth, administer justice to the plaintiff.

232. The Cmwlth of PA officers and officials put the plaintiff through two trials in two separate counties (simultaneously) disregarding the laws of the land. This has caused great damage and harm to the plaintiff that he still suffers to this day. He is illegally being held against his will in the Commonwealth's penal system for decades and still on going.

233. WHEREFORE, pursuant to 42 U.S.C. §§ 1983 and 1988 and based on the defendants malicious prosecution and there were damages to the plaintiff and currently ongoing damages for which plaintiff demands compensatory and punitive damages for as well as any and all declaratory judgments or injunctions allowable under the rule of law that will return the plaintiff to the position he would have been but not been for this abuse of power. VENUE must remain where the order in question was rendered to avoid the fraud previously perpetrated or perpetuated by the defendants who kept the facts of this case and matter from coming to light in order to preserve their unlawful convictions.

## COUNT VII - 42 U.S.C. § 1983 ABUSE OF PROCESS (by Plaintiff against all Commonwealth's Defendants)

234. Paragraphs 1 through 233 are incorporated herein by reference, as though each were duly set forth herein at length.

235. This case and matter cannot be pursued effectively if venue does not remain in the Northern District Court of New York.

236. It is believed and averred that the defendants have committed "abuse of process" prosecuting the plaintiff. The plaintiff still falls within the statute of limitations because, as the Supreme Court explained in *Fine v. Checcio*, 870 A.2d 850 (Pa. 2005), A cause of action accrues when the plaintiff could have first maintained the action to a successful conclusion. The plaintiff can only maintain a successful conclusion through this venue.

237. The common law cause of action for abuse of process "is defined as the use of legal process against another " primarily to accomplish a purpose for which it was not designed." *Rosen v. American Bank of Rolla*, 627 A.2d 190, 192 (Pa. Super. 1993) (citation omitted). Abuse of process is, in essence, the use of legal process as a tactical weapon to coerce a desire result that is not the legitimate object of the process, as the Court can see in paragraphs 12-31. The plaintiff has shown how the Defendants (1) used a legal process against the plaintiff, (2) primarily to accomplish a purpose for which the process was not designed; and (3) harm has been caused to the plaintiff.

238. Venue must remain in Northern District Court of New York because its the only venue that will provide the plaintiff the protection of the law and/or adequate access to the courts guaranteed to him by the first amendment.

239. WHEREFORE, pursuant to 42 U.S.C. §§ 1983 and 1988 and based on the defendants abuse of process, there were damages to the plaintiff and currently ongoing damages for which plaintiff demands compensatory and punitive damages for as well as any and all declaratory judgments or injunctions allowable under the rule of law that will return the plaintiff to the position he would have been but not been for this abuse of power. VENUE must remain where the order in question was rendered to avoid the fraud previously perpetrated or perpetuated by the defendants who kept the facts of this case and matter from coming to light in order to preserve their unlawful convictions.

### COUNT VIII - 42 U.S.C. § 1983 ABUSE OF POWER (by Plaintiff against all Commonwealth's Defendants)

240. Paragraphs 1 through 239 are incorporated herein by reference, as though each were duly set forth herein at length.

241. This case and matter cannot be pursued effectively if venue does not remain in the Northern District Court of New York.

242. It is believed and averred that the defendants will continue to abuse their power and Authority in the form of "malfeasance in office" or "official abuse of power." They have commissioned these unlawful acts enumerated in paragraphs 12-31. It was done in an official capacity. They used their official position of power against the plaintiff and continuously takes advantage of their place of privilege illegally and intentionally against the plaintiff. The prosecutors abuse of power (aka prosecutorial misconduct) are breaking the laws of the land and it breached the professional code of conduct prosecuting and working plaintiff's case.

67

243. Venue must remain in Northern District Court of New York because its the only venue that will provide the plaintiff the protection of the law and/or adequate access to the courts guaranteed to him by the first amendment.

244. WHEREFORE, pursuant to 42 U.S.C. §§ 1983 and 1988 and based on the defendants willful, deliberate, malicious and intentional disregard of the truth, there were damages to the plaintiff and currently ongoing damages for which plaintiff demands compensatory and punitive damages for as well as any and all declaratory judgments or injunctions allowable under the rule of law that will return the plaintiff to the position he would have been but not been for this abuse of power. VENUE must remain where the order in question was rendered to avoid the fraud previously perpetrated or perpetuated by the defendants who kept the facts of this case and matter from coming to light in order to preserve their unlawful convictions.

## COUNT VII - 42 U.S.C. § 1983 FALSE IMPRISONMENT, UNLAWFUL RESTRAINT, KIDNAPPED, INVOLUNTARY SERVITUDE, (by Plaintiff against all Commonwealth's Defendants)

245. Paragraphs 1 through 244 are incorporated herein by reference, as though each were duly set forth herein at length.

246. This case and matter cannot be pursued effectively if venue does not remain in the Northern District Court of New York.

247. The defendants have plaintiff intentionally confined, falsely imprisoned and unlawfully restraint without legal authority in the Cmwlth of PA's Department of Corrections for decades.

248. Venue must remain in Northern District Court of New York because its the only venue that will provide the plaintiff the protection of the law and/or adequate access to the courts guaranteed to him by the first amendment.

249. WHEREFORE, pursuant to 42 U.S.C. §§ 1983 and 1988 and based on the defendants false incarceration of the plaintiff there were damages to the plaintiff and currently ongoing damages for which plaintiff demands compensatory and punitive damages for as well as any and all declaratory judgments or injunctions allowable under the rule of law that will return the plaintiff to the position he would have been but not for the fraud. VENUE must remain where the order in question was rendered to avoid the fraud previously perpetrated or perpetuated by the defendants who kept the facts of this case and matter from coming to light in order to preserve their unlawful convictions.

### COUNT VIII - 42 U.S.C. § 1983 OBSTRUCTION OF COURT ORDERS, OBSTRUCTION OF JUSTICE, CONTEMPTS, POWER OF COURT (by Plaintiff against all Commonwealth's Defendants)

250. Paragraphs 1 through 249 are incorporated herein by reference, as though each were duly set forth herein at length.

251. This case and matter cannot be pursued effectively if venue does not remain in the Northern District Court of New York.

252. The Cmwlth of PA officials and officers snubbed the power of the NYS court, Exhibit K clearly shows how the prosecutor's office felt about the New York Order. They acted like the Order was insignificant and had no power, force or effect, whatsoever over the criminal case against the plaintiff. They chose to look for ways to continue to prosecute the plaintiff despite that Order.

253. The Cmwlth of PA's officers and officers show little regard to the laws and power of the NYS court. In plaintiff's case, they think there is little NYS courts can in plaintiff's case, even though that is absolutely not the law. NYS is forever cemented and attached to criminal case numbers 142-1980 and CR-81-71 when the moment they became partied with the Commonwealth to the 1981 IADA, Article IV. It is that "Act" that controlled and dictated what happened in those criminal cases. In 1989, NYS courts had personam and subject matter jurisdiction over those criminal charges listed in those Counties detainers. The Commonwealth officers and officials were the ones who brought those criminal cases to the NYS court when they attempted to file a second IADA, Art. IV. It was why the NYS court found the Commonwealth had violated the IADA, Art. IV(e) "anti-shuttling" clause. To file a second IADA, IV only proved to the court they violated the first one they had in 1981. The Commonwealth officers and officials were mandated to cooperate with the party state, NYS decision in effectuating the IADA, Art. IV purpose. The NYS court had the law that mandated them to follow the absolute language of the IADA, Article IV. It is the federal courts responsibility to make sure through their diversity power to demand the Commonwealth to comply with that 1989 NYS Order which dismissed those criminal charges with prejudice and comply with evoking the protections the habeas corpus relief provided the plaintiff.

254. The NYS Court did not know that during the time the 1988 pre-transfer hearing, the Cmwlth of PA courts had the plaintiff on trial for those same criminal charges that were being dismissed by the NYS court judge as well. Despite the fact that the Commonwealth did not have subject matter jurisdiction or personam jurisdiction

over the plaintiff at the time. After the NYS court's 1989 Order was made, the Cmwlth of PA courts continued on with their trials on those same criminal charges.

255. WHEREFORE, pursuant to 42 U.S.C. §§ 1983 and 1988 and based on the defendants willful, deliberate, malicious and intentional disregard of the truth, there were damages to the plaintiff and currently ongoing damages for which plaintiff demands compensatory and punitive damages for as well as any and all declaratory judgments or injunctions allowable under the rule of law that will return the plaintiff to the position he would have been but not for the fraud. VENUE must remain where the order in question was rendered to avoid the fraud previously perpetrated or perpetuated by the defendants who kept the facts of this case and matter from coming to light in order to preserve their unlawful convictions.

### COUNT IX - 42 U.S.C. § 1983 TAMPERING, ALTERATION OF RECORD, AND CONCEALMENT, REMOVAL OF RECORDS (by Plaintiff against all Commonwealth's Defendants)

256. Paragraphs 1 through 255 are incorporated herein by reference, as though each were duly set forth herein at length.

257. This case and matter cannot be pursued effectively if venue does not remain in the Northern District Court of New York.

258. The defendants have modified and altered the Snyder County's official record. Upon inspection of the record, any fact finder can see that there is no mention of the order made by the NYS court being recorded in the Commonwealth. They refused to dismiss their criminal charges due to them violating the "anti-shuttling" clause. They did not record the fact the plaintiff was released into Northumberland County's custody on March 2, 1981, and made no mention of plaintiff ever returning

to NYS on or about June 10,1981, this has caused him irreputable harm. This record tampering had caused extreme damage to the plaintiff in the appellate processes. It has directly is responsible for obstructing justice and caused the plaintiff to be deprived of his life, liberty and freedoms. This calculative act of tampering with the plaintiff's official record and Northumberland County calculative scheme of sealing up the plaintiff's criminal case has been directly responsible forfeiting decades of plaintiff's life.

259. WHEREFORE, pursuant to 42 U.S.C. §§ 1983 and 1988 and based on the defendants willful, deliberate, malicious and intentional disregard of the truth, there were damages to the plaintiff and currently ongoing damages for which plaintiff demands compensatory and punitive damages for as well as any and all declaratory judgments or injunctions allowable under the rule of law that will return the plaintiff to the position he would have been but not for the conspiracy Snyder County and Northumberland County's officers and officials record tampering, sealing of their criminal records to prevent the appellate courts from inspecting and scrutinizing it and their fraud upon the court. VENUE must remain where the order in question was rendered to expose the fraud previously perpetrated by the defendants. and expose the facts relating to this case and bring to light the matter of their unlawful convictions.

## COUNT X - 42 U.S.C. § 1983 PERJURY, FALSE DECLARATIONS BEFORE COURT, AND MAKING FALSE STATEMENTS (by Plaintiff against all Commonwealth's Defendants)

260. Paragraphs 1 through 259 are incorporated herein by reference, as though each were duly set forth herein at length.

261. This case and matter cannot be pursued effectively if venue does not remain in the Northern District Court of New York.

262. The state prosecutors habitually perjured themselves and gave false statements regarding what happened in the Commonwealth's criminal cases since 1981. Like for e.g. ... they claimed that the plaintiff was transferred to the Commonwealth under Enumerated in paragraphs 12-31 and evidenced in Exhibits A through PP, Art. III. They also claimed when he went to federal court that the plaintiff did not exhaust his state remedies. When he went back to state court claimed he exhausted his state remedies. Upon returning to the federal court he was time barred under the AEDPA of 1996. This cause the plaintiff serious damage and prevented the plaintiff from getting federal habeas relief to correct this egregious miscarriage of justice.

263. WHEREFORE, pursuant to 42 U.S.C. §§ 1983 and 1988 and based on the defendants willful, deliberate, malicious and intentional disregard of the truth, there were damages to the plaintiff and currently ongoing damages for which plaintiff demands compensatory and punitive damages for as well as any and all declaratory judgments or injunctions allowable under the rule of law that will return the plaintiff to the position he would have been but not for the fraud. VENUE must remain where the order in question was rendered to avoid the fraud previously perpetrated or perpetuated by the defendants who kept the facts of this case and matter from coming to light in order to preserve their unlawful convictions.

### COUNT XI - 42 U.S.C. § 1983 BRADY VIOLATIONS
### (by Plaintiff against all Commonwealth's Defendants)

264. Paragraphs 1 through 263 are incorporated herein by reference, as though each were duly set forth herein at length.

265. This case and matter cannot be pursued effectively if venue does not remain in the Northern District Court of New York.

266. As evidenced in paragraphs 21-79 along with Exhibits A through PP

267. The Defendants failed to disclose evidence to the courts that were in the favor of the plaintiff. The Commonwealth's officers and officials failed to disclose the truth to as how these criminal charges materialized against the plaintiff. Then how later in time they were the receivers of the Order made by the NYS court dismissing their criminal charges and the plaintiff was granted habeas relief to prevent him to ever be charged on those same criminal charges ever again. The Commonwealth officers and officials refused to record this Order with the Cmwlth of PA. These acts have created severe bias and prejudice against the plaintiff and resulted in the plaintiff being wrongfully convicted and falsely imprisoned for decades.

268. Under *Brady v. Maryland*, 373 U.S. 83 (1963). The prosecutor is required to disclose under this rule evidence favorable to the accused — evidence that goes towards negating a defendant's guilt or evidence going to the credibility of a witness. If the prosecution does not disclose material exculpatory evidence under this rule, and prejudice has ensued, the evidence will be suppressed. The evidence will be suppressed regardless of whether the prosecutor knew the evidence was in his or her possession, or whether or not the prosecutor intentionally or inadvertently withheld the evidence from the defense. Further, in cases subsequent to Brady, the Supreme Court has eliminated the requirement for a defendant to have requested a

favorable information, stating that the Prosecution has a constitutional duty to disclose, that is triggered by the potential impact of favorable but undisclosed evidence. See *Kyles v. Whitley*, 514 U.S. 419, 434 (1955); *United States v. Bailey*, 473 U.S. 667 (1985).also see: *Giles v. Maryland* (U.S. 1967), *Miller v. Pate* (U.S. 1967), *United States v. Agurs* (U.S. 1976);

269.A Brady violation, by definition, cannot be treated as a harmless error. *Kyles*, 514 U.S. at 433-438; It violates Fifth and Fourteenth Amendments.

270.WHEREFORE, pursuant to 42 U.S.C. §§ 1983 and 1988 and based on the defendants willful, deliberate, malicious and intentional disregard of the truth, there were damages to the plaintiff and currently ongoing damages for which plaintiff demands compensatory and punitive damages for as well as any and all declaratory judgments or injunctions allowable under the rule of law that will return the plaintiff to the position he would have been but not for the deceit, perjury and fraud. VENUE must remain where the order in question was rendered to avoid the fraud previously perpetrated or perpetuated by the defendants who kept the facts of this case and matter from coming to light in order to preserve their unlawful convictions.

### COUNT XII - 42 U.S.C. § 1983 RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) VIOLATIONS  (by Plaintiff against all Commonwealth's Defendants)

271.Paragraphs 1 through 270 are incorporated herein by reference, as though each were duly set forth herein at length.

272.The Plaintiff unwittingly got ensnared in a web of a criminal syndication that was being operated by at least one tri-county undercover law enforcement officer who

was working along side with the district attorney's office to entrap people to get their successful criminal convictions that help them to obtain personal gain, and for professional and political advancement. In 1990, the assistant district attorney who constructed the February 22, 1989, document, attached as one of the exhibits, began working for Syracuse, New York's as one of their public defenders, and still is working there to this very day. These are not just allegations but can be proven through the phase of discovery.

273. The Plaintiff before 1981, had not traveled in either Northumberland or Snyder County because none of his close family and friends lived in those counties. The plaintiff went to school and had family in Mifflin County and had family in Centre County and sometimes spent his time in Juniata County, however, never did he ventured into those counties these prosecutors claimed the plaintiff committed crimes in. This is not just allegations but can be proven through the phase of discovery.

274. The plaintiff's nightmare of being a unwitting participant in the counties criminal empire assigned as their scape goat began in 1980, when two prosecutors, from Snyder County and Northumberland County, were facing with a huge dilemma. They were figuring out what to do about an undercover law enforcement officer who was about to be exposed for his undercover illegal activity when criminal charges were being alleged against him by two girls who was working for him as prostitutes.

275. This tri-county undercover officer who turned "pimp" was being accused of rape and kidnapping. He had talked these girls into working for him as his prostitutes

and subjected them to human trafficking. These girls did not know their pimp was a tri-county undercover cop, and they were unwittingly part of a police net to uncover drug trafficking in their perspective communities. These allegations were jeopardizing the tri-county undercover cop's "criminal syndication", and the district attorney's offices could not allow this to happen. These prosecutors had to find a resolution fast, especially since one of the girls in Northumberland County had married the Chief of Police in Northumberland County, who impregnated her while she was in his custody. They not only had to protect the identity of the undercover policeman, but the reputation of the Chief of Police.

276. The resolution fell on their laps when the prosecutors from these two counties was informed of the plaintiff's predicament in New York in 1980, and took advantage of the situation by requesting from Attica Correctional Facility the plaintiff's intake picture taken on November 13, 1980. They took this photo and approached the girls coercing them to use this photo to draw up a second composite that could be used as the basis for an arrest warrant and taking temporary custody of plaintiff under an Art. IV of the Interstate Agreement on Detainers Act.

277. Without a pre-transfer hearing, the plaintiff was brought down to Pennsylvania on February 16, 1981. On the 27th, while waiting for his court appearance. As he was waiting, a girl sat next to him and they began conversing. They talked about how the plaintiff looked like Paul McCartney (from the rock group "The Beatles") and how upsetting it was that John Lennon was just assassinated. Little did the plaintiff know, this girl was why he was there. He found out when this girl was called into court, and to her surprise, seen the plaintiff sitting at the defendant's table. She

freaked out and started to frantically tell the judge that the plaintiff was not her perpetrator. The judge told her to stop or she will find herself in contempt of court and locked up. So she went to the plaintiff's public defender and told him about her original composite she made, and how he in no way resembled that composite. However, his public defender cared less, and he chose not to use this information to get the criminal case thrown out of court.

278. The prosecutor saw his case against the plaintiff rapidly falling apart. So three days later, March 2nd, the plaintiff's public defender and prosecutor's office transferred him to Northumberland County. The plaintiff only made one court appearance in Snyder County before the plaintiff was shipped off to Northumberland County. Once the plaintiff was in Northumberland County, his public defender laughed at him when he told him that his criminal case in Snyder County was not over. They belittled and ridiculed the plaintiff and once they saw their criminal case was falling apart like it did in Snyder County, they returned the plaintiff to NYS on June 10, 1981, and both counties prosecutors continue on with their sham prosecutions simultaneously, without the plaintiff present to defend himself.

279. The cases in the Cmwlth against the plaintiff were so weak from the very start. The district attorney's office had to resort to threatening, intimidating and/or giving special favors, gifts and attention to "witnesses" to keep the sham prosecutions going. They even threatened plaintiff's ex-wife to keep her quiet. They told her they would take their son they had together from her custody. They did everything possible to get their successful conviction of the plaintiff.

280. The plaintiff, a legal resident of NYS as these trials were taking place. It is the belief of the plaintiff that a NYS jury should hear the facts relating to how one of their own was being targeted and victimized by the Cmwlth of PA, giving him the opportunity to correct this egregious miscarriage of justice, granting him monetary damages he deserves. The plaintiff is kidnapped! He is being held against his will in PADOC. Forced into involuntary servitude to the Cmwlth of PA, for decades. . (A true and correct copy of the document of plaintiff's NYS citizenship (1984-85 Student Aid Report where he was granted financial to attend Ulster County Community College in Stone Ridge, New York) is attached hereto as Exhibit MM)

281. This case will give the plaintiff an opportunity to expose the truth as to how the Cmwlth has gone rogue, and prove beyond a preponderance of evidence (beyond any reasonable doubt) that the Commonwealth counties prosecutors were engaging in a RICO law violations when they began prosecuting the plaintiff to cover up their crimes. and allow justice to finally prevail.

282. The plaintiff wants full discovery by both plaintiff and defendants. The plaintiff is not alone in this. His daughter is willing to find witnesses as to the facts that happened in this case. Through the years, the plaintiff has been contacted by a half-sister of the tri-county undercover prosecutor and found out some interesting information, like, e.g. she was beaten up by her half-brother for looking inside his wallet without permission and saw he had a copy of the plaintiff's intake picture in it. He was contacted by someone to inform the plaintiff that he was truthful when he said those girls were given a picture by the prosecutors to accurately describe him to the artist who made those composites. These contacts were unprovoked by

the plaintiff. There are people out there who do want the truth to come out. Through the passage of time, with the change of venue, along with the help of plaintiff's daughter, The ability to find people to shed some light as to what happened in plaintiff's case is remarkable.

283. The RICO Act violations committed by the Cmwlth's authorities had jeopardized the plaintiff's safety and violated his human rights by convicting him on crimes they knew he did not do. They successfully complete their objective to use him as their scape goat. They abused their power and process that resulted in the plaintiff being placed in high security prisons, depriving him access to the rehabilitative programs they offered. This also caused the plaintiff to be placed with hardened criminals where he was suffered a racial motivated attack with an ice-pik, and wound up shattered all the bones his right hand to save his own life. It took years of physical therapy to regain his ability to use it again. He later was attacked when an inmate popped out his eye from its socket and it dangled out its socket for a week until it was popped back inside his head. The plaintiff was very fortunate not to have lost his vision in that eye. Had the defendants not been used as a scape goat to hide the Cmwlths criminal syndication they had going on, he would have remained in a minimum security prison and would have graduated with an Associates Degree from Ulster Community College. If he chose, he could have gone even further with his education and revel in the benefits he would had gotten from the rehabilitation programs, and had very productive life and a fulfilling career in his chosen profession, with unlimited opportunities. At his current age of 69-years-old, he could be thinking right now about retiring, spending valuable time

with family and spending quality time with his grandchildren. He could be living the American dream. However, he Cmwlth of PA's officials and officer took all that away from him and forfeited decades of his life.

284. The RICO violations coverup caused the Cmwlth of PA officers and officers to manufacture evidence against the plaintiff to give cause for indictments. Indictments that were based on lies. They tampered with the witnesses, coercing false testimony, keeping their criminality from being exposed and violating the RICO Act. Those who participated in the criminal syndication have been prosperous and triumphant in their political and professional careers, and economical growth. During discovery phase, the plaintiff can prove that the prosecutor was sworn in as judge of the common pleas court and presided over the plaintiff's cases where he was the prosecuting officer. He can prove a prosecutor from Snyder County working as a magistrate judge in Northumberland County, a public defender representing the plaintiff in Snyder County and then became the public defender in Northumberland County. A Snyder County public defender who was working with the prosecutors office, exhausted his case, and immediately began working for them as a assistant district officer. A Northumberland County public defender who worked on plaintiff's case and then began working for the district attorney's office. The plaintiff can show how these officers colleagues aided in keeping this corruption away from becoming exposed when they recuse themselves and assigning plaintiff's case to them. There is no doubt more digging into both Northumberland and Snyder County's government officers and officials will reveal how everyone is interconnected and intertwined, making it possible for these RICO

Act violations to be kept under wraps. It would also reveal how the plaintiff was prevented from getting himself justice. The heavy influence these government officers and officials does not effect just the judicial branch of government, it also reached into the Department of Corrections. They are able to have its correctional officers to physically punish the plaintiff and get their retribution when the plaintiff keeps moving forward in his fight for justice. During the discovery phase, the plaintiff can provide decades of documents, through the grievances he filed, to show the jury of his peers, by the preponderance of evidence (beyond a reasonable doubt), the horrendous treatment he has received through the decades. They will see by these grievances a pattern of abuse he suffered by the hands of those who work for the PADOC, as he kept fighting for justice. It affected his treatment in prison. They will see it was more likely than not these officers and officials were working through the PADOC officers to stop the plaintiff's from fighting. They wanted the plaintiff to voluntarily submit to them. They wanted him to accept living the rest of his life in false imprisonment. The plaintiff refuses! He will NOT submit to his kidnappers. The framers of the AEDPA of 1996 did not intend for the Defendants to be able to use this "Act" in this way.

285. WHEREFORE, pursuant to 42 U.S.C. §§ 1983 and 1988 and based on the defendants willful, deliberate, malicious and intentional disregard of the truth, there were damages to the plaintiff and currently ongoing damages for which plaintiff demands compensatory and punitive damages for as well as any and all declaratory judgments or injunctions allowable under the rule of law that will return the plaintiff to the position he would have been but not for the fraud. VENUE must

remain where the order in question was rendered to avoid the fraud previously perpetrated or perpetuated by the defendants who kept the facts of this case and matter from coming to light in order to preserve their unlawful convictions.[16]

**Prayer for Relief**

**WHEREFORE**, Plaintiff request the following relief:

Paragraphs 1 through 285 are incorporated herein by reference, as though each were duly set forth herein at length.

(1) Enter a permanent injunction and declaratory relief as is necessary to protect the interest of the plaintiff allowable under the rule of law and will return the plaintiff to the position he would have been had it NOT been for the Cmwlth of PA's officers and officials committing the following acts against him: perjury, abuses of power, abuses of process, malicious prosecution, unlawful restraint, false imprisonment, obstruction of justice, obstruction of court orders, contempt of court, record tampering, sealing and concealment of official records, ineffectiveness assistance of counsel, abuses of office, violations of Oath of Office, malfeasance of public trust, making false statements and declarations, wrongful conviction, violation of civil rights, deprivation of rights under color of law, kidnapping, trafficking of individuals, involuntary servitude, unlawful conduct regarding documents, theft by unlawful taking of property, conspiracy against rights of citizens, conspiracy to deprive plaintiff his life and freedoms, committing fraud upon the court, human rights abuse, inchoate crimes contributing to this egregious

---

[16] The acts (found in this Complaint) committed by the officers and officials from the Cmwlth of PA are not necessary to convict a guilty man but it is to convict an innocent one.

miscarriage of justice that resulted in the plaintiff being irrefutably damaged that is ongoing to the present day. **AND**

(2) Pursuant to 42 U.S.C. § 1983, plaintiff demands compensatory and punitive damages against the defendants jointly and/or severally in the amount $20,000.00 (compensatory) and ($70,000) punitive <u>for each count in paragraph (1)</u>, plus costs and interest. **AND**

(3) Pursuant to 42 U.S.C. § 1983, plaintiff demands compensatory and punitive damages against the defendants jointly and/or severally, in the amount of $10,000.00 (compensatory) and $50,000 (punitive) for each of the days he has been incarcerated based on criminal charges that were a legal nullity, plus interest, costs, attorney fees and delay damages.

(4) Pursuant to 42 U.S.C. § 1983, plaintiff demands compensatory and punitive damages against the defendants jointly and/or severally, in the amount of $10,000.00 (compensatory) and $50,000 (punitive) for damages not specified in paragraphs (1)-(3) and found in Paragraphs 1 through 282, that are still ongoing, plus interest, costs.

(5) Further prays for any additional relief as the interests of justice may require and deems appropriate.

**DEMAND FOR JURY TRIAL**
Plaintiff demand a trial by jury on all issues, matters, counts and causes of action.
**By my signature, I attest that to the best of my current knowledge and understanding all matters of law and facts set forth are accurate and true.**

Respectfully Submitted,

Dated: <u>November 15, 2021</u>

John Robert McCool

John Robert McCool

**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| John R. McCool, | CIVIL ACTION |
| **Plaintiff** | NO. |
| and | |
| NORTHUMBERLAND COUNTY & SNYDER COUNTY, MUNICIPALITIES of the COMMONWEALTH OF PENNSYLVANIA, UNITED STATES Attorney General, Merrick B. Garland, NY Attorney General, Letitia James, DA, Michael Piecuch, DA, Anthony Matulewicz, PA Attorney General, Joshua Shapiro, in their official capacity | **COMPLAINT** |
| | JURY TRIAL DEMANDED |
| **Defendants** | |

## CERTIFICATE OF SERVICE

I, JOHN ROBERT MCCOOL, certify that on this day of November 15, 2021, I caused to be served the foregoing **COMPLAINT, EXHIBITS, COVER SHEET, FORM AO398, AO399** to the parties listed below via FIRST CLASS, UNITED STATES MAIL:

SNYDER COUNTY DISTRICT ATTY
Michael Piecuch, DA
9 West Market Street,
P.O. Box 217
Middleburg, PA 17842

NORTHUMBERLAND CO. DISTRICT ATTY
Anthony Matulewicz, DA
201 Market Street
3rd Floor
Sunbury, PA 17801

NEW YORK ATTY GENERAL
Letitia James, AG
The Capitol
Albany, NY 12224-0341

PENNSYLVANIA ATTORNEY GENERAL
Joshua Shapiro
16th Floor, Strawberry Square
Harrisburg, PA 17120

UNITED STATES ATTY GENERAL
Merrick B. Garland, AG
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington D.C. 20530-0001

*John Robert McCool*
John Robert McCool (DN4994)
SCI-Coal Township
1-Kelly Drive
Coal Township, PA 17866